IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

AMC, LLC, an Oregon limited liability company,

    Plaintiffs,

vs.

NORTHWEST FARM FOOD COOPERATIVE, a Washington corporation, and NATIONAL FOOD CORPORATION, a Washington corporation,

    Defendants.

Case No. 6:17-cv-00119-AA
**OPINION AND ORDER**

AIKEN, District Judge:

Defendant and counterclaim plaintiff Northwest Farm Food Cooperative ("NW Farm") filed this motion for partial summary judgment on their counterclaims against plaintiff AMC, LLC ("AMC") for breach of contract and breach of implied covenant of good faith and fair dealing, seeking an order barring AMC from recovering damages for future economic losses due to those breaches. For the reasons that follow, NW Farm's Motion for Partial Summary Judgment (doc. 46) is DENIED.

Page 1 – OPINION AND ORDER

## BACKGROUND

AMC is a family-owned mink ranch. AMC alleges that almost 11,000 of its mink died in November 2016 after eating spent hen feed ordered from NW Farm that was contaminated with botulism. After the mink died, AMC and NW Farm participated in a mediation that produced an Interim Mediated Settlement Agreement ("the Agreement").

Under the Agreement, NW Farm would "pay to AMC $250,000 within ten (10) days of the execution of this agreement [and NW Farm would] be entitled to a reduction in liability by this amount in any future legal proceedings between AMC and [NW Farm] concerning AMC's Claim." Interim Meditated Settlement Agreement ¶ 1 (doc. 47-1). In return, AMC would "make a good faith effort to promptly purchase and obtain approximately 250 suitable male mink breeders, though the parties recognize that the transportation challenges may preclude successful delivery." *Id.* at ¶ 2. Additionally, the total amount that NW Farm

> would pay on the Claim, and the total amount that AMC could collect against [NW Farm], is $1,000,000 ("the Cap"), including the $250,000 paid under paragraph 1 of this Agreement, even if AMC ultimately obtains a judgment against [NW Farm] in excess of the Cap. AMC shall not be required to return any portion of the $250,000 paid under paragraph 1, even if AMC fails to ultimately obtain a judgment for $250,000 or more.

*Id.* at ¶ 3. The parties agreed on a common purpose or goal of the contract, "which is to provide a payment to AMC now in exchange for limiting [NW Farm's] liability for AMC's claims to $1 million total." *Id.* at ¶ 8.

Page 2 – OPINION AND ORDER

After the parties signed the Agreement on November 22, 2016, NW Farm paid AMC $250,002. AMC deposited the check on November 29, 2016, and within a week, AMC used the $250,002 to pay off debt, including $190,000 to Columbia Bank. AMC did not use any of the money to purchase mink. Arritola Dep. 424:2-4 (doc. 47-4 at 2).

According to Richard Arritola, an owner and principal manager of AMC, "the genealogy of mink is important for breeding," so "AMC could not buy breeder mink from just any available source." Arritola Decl. ¶ 9 (doc. 64). During the mediation and after he signed the Agreement, Arritola "made multiple calls to Krieger Mink, [his] supplier in Wisconsin, trying to arrange delivery of more breeder mink," but was unable to "due to the time of year and the weather." *Id.* at ¶ 8. He asked Krieger Mink whether the mink could be shipped by commercial air but was told no. Arritola did not reach out to airlines to confirm that they would not ship mink. Arritola did not truck the mink from Wisconsin, because he does not "drive that far in that cold of weather. And [he] didn't have the equipment to bring back any number of mink properly." Arritola Dep. 363:18-20 (doc. 66-2 at 8).

Arritola also reached out to two mink ranches in Oregon, Carl Salo and Oregon Mink. They were the only ranches in the state that Arritola knew of with breeder-quality mink of the same genealogy. AMC obtained 35 breeder mink from Oregon Mink but did not get mink from Carl Salo, because Salo's herd was infected with Aleutian disease. Arritola did not contact any other breeders in Oregon, Washington, Idaho, or the Midwest.

Around the same time, Arritola was negotiating with Columbia Bank to obtain additional financing to allow AMC to continue its business operations.[1] After his conversation with Mr. Justus, the bank employee who managed Columbia Bank's relationship with AMC at the time, Arritola believed "that for AMC to continue to receive financing, [he] had to pay as much as possible toward the outstanding line of credit." Arritola Decl. ¶ 13. Because Arritola believed that he could not get additional breeder mink before the end of the year, he decided to pay the bank $190,000. *Id.* at ¶ 14.[2]

AMC then sued NW Farm and another defendant, National Food Corporation, in this court, asserting two tort claims and five contract claims. In response, NW Farm counterclaimed for breach of contract and breach of implied covenant of good faith and fair dealing. NW Farm now moves for partial summary judgment on those counterclaims.

---

[1] It is unclear precisely when these negotiations happened. In his declaration, Arritola says that at the same time he was trying to buy more mink, he was trying to figure out how to keep the business operating. The very next paragraph mentions his conversation with Mr. Justus, the bank employee who managed Columbia Bank's relationship with AMC at the time. In Mr. Justus's declaration, he said the negotiations took place "in or around November 2016." Justus Decl. ¶ 4 (doc. 93).

[2] NW Farm argues that the Court should disregard the Justus Declaration as a sham because certain statements in the declaration are inconsistent with Justus' prior deposition testimony that Arritola was not required to pay the bank and made a voluntary choice to do so. *See* Justus Dep. 79:21-25 (doc. 47-5 at 2). The Court agrees with NW Farm that Justus' declaration implies that AMC was required to pay the bank to secure additional financing – that is, *if AMC wanted* to secure additional financing. But that implication is compatible with his prior testimony. Together, the deposition and declaration testimony suggest that Arritola voluntarily chose to pay the bank so that AMC could secure additional financing to continue its operations. Because the testimony is compatible, the Court will not strike the Justus Declaration.

## LEGAL STANDARDS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The materiality of a fact is determined by the substantive law on the relevant issue, while the authenticity of a dispute is determined by inquiring whether a reasonable jury could return a verdict for the nonmoving party in light of the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324; Fed. R. Civ. P. 56(e). "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

## DISCUSSION

NW Farm moves for summary judgment on its breach of contract and breach of good faith and fair dealing claims. Under Washington law,[3] to prevail on a breach

---

[3] Washington law applies because the Agreement expressly stated that "[t]his Agreement will be construed pursuant to Washington law, without giving effect to any of its choice of law provisions." doc. 47, Ex. 1 at ¶ 8. Additionally, both parties have cited and applied Washington law in their briefs. *See Miller v. Miller*, 276 Or. 639, 647 (1976) ("The overriding rule in the construction of contracts is that the intention of the parties prevails.")

of contract claim, a plaintiff must demonstrate that there is a valid contract between the plaintiff and defendant, "the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant." *Nw. Indep. Forest Mfrs. v. Dep't of Labor and Indus.*, 78 Wash. App. 707, 712 (1995). The breach does not need to be material, but only a "failure to perform a contractual duty." *TMT Bear Creek Shopping Ctr., Inc. v. Petco Animal Supplies, Inc.*, 140 Wash. App. 191, 210 (2007). Damages "should be in an amount sufficient to place the injured party in the same economic position it would have occupied had the contract been fully performed." *Id.*

In a breach of good faith and fair dealing claim, the elements are the same, except the duty at issue is the implied duty of good faith and fair dealing that exists in every contract. *See Thomas v. Flagstar Bank, NA*, No. C15-1309RSL, 2018 WL 1470836, at *3 (W.D. Wash. Mar. 26, 2018) (applying elements from *Nw. Indep. Forest Mfrs.* to a breach of good faith and fair dealing claim); *Badgett v. Sec. State Bank*, 116 Wash. 2d 563, 569 (1991) ("There is in every contract an implied duty of good faith and fair dealing.").

NW Farm asserts that AMC (1) breached its express duty to "make a good faith effort to promptly purchase and obtain approximately 250 suitable male mink breeders, and (2) breached the implied covenant of good faith and fair dealing "by disregarding [NW Farm's] justified expectations under the Agreement that it would promptly purchase replacement mink breeders, or make a good faith effort to do so."

Mot. Summ. J. at 7-8. Instead, NW Farm asserts, AMC spent the money on old debt, which was not the justified expectation under the Agreement.[4]

AMC asserts that it did make a good faith effort to promptly purchase and obtain 250 mink. AMC asserts that it was able to obtain 35 male mink breeders but was not able to obtain the full 250 because of circumstances out of their control and the need to purchase mink from a specific genealogy. Instead, AMC used the money to mitigate their losses by obtaining financing to keep the business operating.

I.   *Breach of Express Duty of Good Faith*

The Agreement was a valid contract between the parties that imposed a duty on AMC to "make a good faith effort to purchase and obtain approximately 250 suitable male mink breeders." The parties dispute whether AMC's effort to obtain replacement male breeders was in "good faith." Washington courts "generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash. 2d 493, 504 (2005). Under Washington law, "[g]ood faith flows from a 'mind indicating honesty and lawfulness of purpose.'" *Yuille v. State Dep't of Soc. & Health Servs.*, 111 Wash. App. 527, 533 (2002) (quoting *Tank v. State Farm Fire & Cas. Co.*, 105 Wash. 2d 381, 385 (1986)).

---

[4] NW Farm also asserts that AMC cannot use the doctrine of impossibility to excuse AMC's breach. However, AMC is not asserting this defense, but rather, is arguing that there is no breach. AMC asserts that their failure to purchase mink cannot be considered a failure to make a "good faith effort," because there were circumstances that prevented AMC from obtaining the full 250 suitable male mink breeders. NW Farm asserts that AMC did not do all they could to obtain 250 mink, but, as explained below, a reasonable jury could find otherwise.

In Washington, "good faith is wholly a question of fact." *Id.*; *see also In re Estate of Palmer*, 145 Wash. App. 249, 263 (2008) ("[G]ood faith is an issue of fact[.]"). Accordingly, summary judgment is only appropriate "if reasonable persons could reach but one conclusion" regarding whether AMC acted in good faith in trying to purchase replacement mink. *Id.* Here, although the parties do not dispute much of the underlying facts, including the actions AMC took to try to obtain the mink, or that AMC decided to use the money to pay off debts after trying for a few days to find mink, reasonable persons could draw differing conclusions from that set of facts.

Drawing all reasonable inferences in AMC's favor, there are serious questions of material fact concerning good faith in this case. As such, summary judgment would be inappropriate.

## II. *Breach of Implied Covenant of Good Faith and Fair Dealing*

"'There is in every contract an implied duty of good faith and fair dealing." *Badgett*, 116 Wash. 2d at 569. "This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Id.* "Good faith performance of a contract requires being faithful to the agreed common purpose of the contract and performing consistently with the justified expectations of the other parties." *Microsoft Corp. v. Motorola, Inc.*, 963 F. Supp. 2d 1176, 1184 (W.D. Wash. 2013). Examples of breach include actions that "(1) evade the spirit of a bargain; (2) willfully render imperfect performance; (3) interfere with or fail to cooperate in the other party's performance; (4) abuse discretion granted under the contract; or (5) perform the contract without diligence. *Id.* "This list is in no way exhaustive, and

indeed it would be nearly impossible to create a complete catalogue of conduct that violates the duty of good faith and fair dealing." *Id.* It is the fact finder's job—in this case the jury—to determine whether a party breached its implied duty of good faith and fair dealing. *See, e.g., Columbia Park Golf Course, Inc. v. City of Kennewick*, 160 Wash. App. 66, 248 P.3d 1067, 1074 (2011); *Microsoft Corp.*, 963 F. Supp. 2d at 1184.

A defendant can breach the implied duty of good faith and fair dealing without a breach of an express contract term if, for example, the contract gives one party discretionary authority to determine a contract term. *Rekhter v. State*, 180 Wash. 2d 102, 111 (2014) (so holding); *see also Scribner v. Worldcom, Inc.*, 249 F.3d 902, 910 (9th Cir. 2001) ("Good faith limits the authority of a party retaining discretion to interpret contract terms; it does not provide a blank check for that party to define terms however it chooses."). In this case, NW Farm argues AMC breached the implied duty by abusing its discretion in interpreting the contract term: "make a good faith effort to promptly purchase and obtain approximately 250 suitable male mink breeders."

A reasonable jury could find, from AMC's actions and the Agreement itself, that AMC did not abuse its discretion and deprive NW Farm of the benefit of AMC's performance. The agreed common purpose or goal of the contract "is to provide a payment to AMC now in exchange for limiting [NW Farm's] liability for AMC's claims to $1 million total." The implied duty of good faith and fair dealing obligates each party to perform "so that each may obtain the full benefit of performance." A reasonable jury could find that AMC did not abuse its discretion when interpreting

the contract term, because AMC's interpretation did not affect NW Farm's benefit under the contract, which is a cap on damages of $1 million.

Additionally, the parties, in the contract, "recognize[d] that the transportation challenges may preclude successful delivery." A reasonable jury could find that the contract term was defined with this additional phrase in the contract.

Therefore, because a reasonable jury could find that AMC made a good faith effort and AMC's actions did not deprive NW Farm of its benefit under the contract, NW Farm is not entitled to summary judgment on its breach of implied covenant of good faith and fair dealing claim.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Partial Summary Judgment (doc. 46) is DENIED.

It is so ORDERED and dated this 25th day of November 2019.

_____
ANN AIKEN
United States District Judge