IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

AMC, LLC,

    Plaintiff,

v.

NORTHWEST FARM FOOD COOPERATIVE and
NATIONAL FOOD CORPORATION,

    Defendants.

Case No. 6:17-cv-00119-AA
**OPINION AND ORDER**

AIKEN, District Judge:

Plaintiff AMC, LLC ("AMC") filed this action against defendants Northwest Farm Food Cooperative ("NW Farm") and National Food Corporation ("NFC"), alleging negligence and product liability claims against both defendants and breach of contract claims against NW Farm in connection with "spent hen" mink feed that AMC bought from NW Farm. For the reasons set forth below, NFC's Motion for Summary Judgement (doc. 48) is granted in part and denied in part.

## BACKGROUND

AMC is a family-run mink ranch that operates as an Oregon limited liability company. AMC's principle place of business is in Mt. Angel, Oregon. AMC is a member of NW Farm's cooperative. NW Farm is a supplier of mink feed and equipment in the Pacific Northwest. NW Farm is a Washington corporation with its principle place of business in Burlington, Washington.

NFC is also a Washington-based corporation and has 5 farms in Washington and one farm in South Dakota. NFC is headquartered in Everett, Washington. NFC is a large volume egg producer. NFC's farms house large numbers of hens for egg-laying purposes only. When NFC's hens stop laying enough eggs, the entire flock is euthanized and replaced. The parties refer to these euthanized hens as "spent hen."

Typically, NFC disposes of the spent hen by sending it to a rendering plant or landfill. However, between 2011 and 2016, NFC sometimes gave its spent hen to NW Farm to process into mink food. Immediately after euthanization and at the barn that had housed the hens, a NW Farm employee ground the spent hen and transferred it to a truck. The ground spent hen was then transported to NW Farm's facility, further ground and emulsified, and frozen into 50 pound blocks before being sold to NW Farm's members.

AMC received a shipment of mink feed from NW Farm in July 2016. Within days of AMC using that feed, AMC's mink began to get sick and die. Approximately 11,000 of AMC's mink died over the course of a week. AMC alleges that the mink died from botulism, that had been in the feed that AMC had bought from NW Farm,

and that the source of the botulism was spent hen that NW Farm had acquired from NFC.

On January 24, 2017, AMC filed a complaint alleging product liability and negligence claims against both NW Farm and NFC and breach of contract claims against NW Farm. Defendants now seek summary judgment on all claims against them. NW Farm's motion for summary judgment will be addressed in a separate opinion.

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The materiality of a fact is determined by the substantive law on the relevant issue, while the authenticity of a dispute is determined by inquiring whether a reasonable jury could return a verdict for the nonmoving party in light of the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324; Fed. R. Civ. P. 56(e). "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201,

1207 (9th Cir. 2008). Any doubt about the existence of a genuine issue of material fact should be resolved against the moving party. *Eastman Kodak Co. v. Image Tech. Serv. Inc.*, 504 U.S. 451, 456 (1992).

## DISCUSSION

NFC seeks summary judgment on AMC's product liability and negligence claims. The parties dispute whether Washington or Oregon law should apply to these claims. As explained in further detail below, NFC moved for summary judgment under Washington law, because AMC appeared to have alleged its product liability claim under the Washington Product Liability Act ("WPLA"). AMC responded, in part, by arguing that summary judgment is not appropriate under Oregon law.

## I. Choice of Law

Federal courts sitting in diversity apply "the forum state's choice of law rules to determine the controlling substantive law." *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005) (citing *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002)). Under Oregon choice of law rules, courts must determine as a threshold issue whether there is a material difference between Oregon law and the law of the other forum. *Waller v. Auto-Owners Ins. Co.*, 174 Or. App. 471, 475 (2001); *see also Machado-Miller v. Mersereau & Shannon, LLP*, 180 Or. App. 586, 591 (2002) ("In analyzing a choice-of-law problem, the threshold question is whether the different states' laws actually conflict with each other.") (citing *Lilienthal v. Kaufman*, 239 Or. 1 (1964)). Where no material difference exists between Oregon law and the law of the proposed alternative forum, Oregon courts will apply Oregon law without regard

to the relative significance of the relationship between the dispute and the proposed alternative forum. *Waller*, 174 Or. App. at 475 (citing *Angelini v. Delaney*, 156 Or. App. 293, 300 (1998)).

As explained below, because the outcome is the same whether Oregon or Washington law applies, there is no actual conflict of laws and the Court need not continue with the choice of law analysis.

## II. AMC's Product Liability Claim

AMC asserts a product liability claim alleging that NFC is subject to strict liability as a manufacturer of the spent hen sold as mink feed. AMC's Complaint referenced the WPLA in the heading of its product liability claim and its allegations appear to reference the elements of a WPLA claim. Compl. at p. 4 (identifying AMC's second claim as "Product Liability – RCW Chapter 7.72"); *id.* at ¶ 21 (alleging that the mink feed was "not reasonably safe").

NFC argues that it is entitled to summary judgment under the WPLA's "economic loss exclusion" and because NFC is not a "manufacturer" within the meaning of the WPLA. AMC responds that Oregon law applies to the product liability claim and that under Oregon law, AMC can recover for damage to its mink. AMC also argues that NFC is a "manufacturer" and a "distributer" under Oregon law and, even if Washington law does apply, NFC is a "manufacturer" under the WPLA.

The Court concludes that NFC is not a "manufacturer" under Washington product liability law or a "manufacturer" or a "distributer" under Oregon product

liability law, because NFC is not engaged in the business of selling spent hen or mink feed made from spent hen.

### A. Legal Framework

AMC argues that NFC is liable as a "manufacturer" under the WPLA. The WPLA defines a "manufacturer" as:

> [A] product seller who designs, produces, makes, fabricates, constructs, or remanufactures the relevant product or component part of a product before its sale to a user or consumer. . . . A product seller acting primarily as a wholesaler, distributor, or retailer of a product may be a "manufacturer" but only to the extent that it designs, produces, makes, fabricates, constructs, or remanufactures the product for its sale.

RCW 7.72.010(2). A "product seller" is defined as:

> [A]ny person or entity that is engaged in the business of selling products, whether the sale is for resale, or for use or consumption. The term includes a manufacturer, wholesaler, distributor, or retailer of the relevant product. The term also includes a party who is in the business of leasing or bailing such products.

*Id.* at (1).

Thus, to be liable as a "manufacturer" under the WPLA, a defendant must be "engaged in the business of selling," leasing, or bailing the relevant product, regardless of whether that defendant is a "manufacturer," "wholesaler," "distributor," or "retailer" of the relevant product.

No Washington case interprets the phrase "engaged in the business of selling" under the WPLA. But in *Buttelo v. S.A. Woods-Yates American Machine Co.*, 72 Wash. App. 397 (1993), the Washington Court of Appeals applied the policy rationale

Page 6 – OPINION AND ORDER

that justifies imposing strict liability on product sellers to determine whether the defendant was "in the business of leasing" the relevant product.[1]

In *Butello*, the plaintiff was injured by an industrial woodworking machine that his employer, Western, a custom remanufacturer of wood products had leased from a lumber mill, Paxport, under the companies' "long-standing lease agreement[.]" *Butello*, 72 Wash. App. at 399. The *Butello* court reviewed pre-WPLA Washington court decisions and decisions from other jurisdictions in which product lessors were held to be subject to products liability claims. The court observed that "courts generally hold that a product lessor will be subject to a products liability claim when the quantity and magnitude of its leasing activities indicates that doing so will advance the public policies supporting the duty" to protect the public from unsafe products. *Id.* at 402. The court then noted three policy reasons that justify imposing that duty on product sellers:

> First, the product seller is in a better position than the consumer to "exert pressure on the manufacturer to enhance the safety of the product." Second, the consuming public typically looks to the seller for advice on selecting, operating, and maintaining the product. Finally, the product seller is in a better position than the consumer to absorb the cost of any injury caused by the product because the product seller can spread the costs of injury among the entire consuming public.

*Id.* at 402–03 (internal citations omitted). The court further explained:

---

[1] The Washington Court of Appeals also reasoned:

> [C]ourts generally hold product lessors to the standard of care imposed on a product seller when the lessor is found to be in the business of leasing, in the same general sense as the seller of personalty is found to be in the business of manufacturing or retailing.

*Buttelo v. S.A. Woods-Yates American Machine Co.*, 72 Wash. App. 397, 403 (1993) (internal quotation marks omitted).

Page 7 – OPINION AND ORDER

> These policy reasons are not advanced when a sale involves an isolated or casual transaction. When the seller is engaged in an isolated or casual transaction, the seller has insufficient volume to influence the product's design or manufacture or to spread the cost of injury over the consuming public. Also, the low volume seller generally lacks the expertise that would induce a buyer's reliance. Because a seller who is involved in an isolated or casual transaction is no better able than the consumer to prevent or to absorb the cost of any injury, courts have been unwilling to hold these sellers to the standard of care imposed on sellers who are "in the business" of selling products.

*Id.* at 403.

Next, the *Butello* court reviewed the provisions of the WPLA to conclude that "the statutory scheme supports the view that products liability principles should be applied only when . . . the volume of transactions is sufficient to give the seller or lessor the ability to guard against and to pay for any injury." *Id.* at 404. Finally, the *Butello* court reasoned that its restrictive interpretation of the WPLA was consistent with the legislative history of the statutory scheme, which "reflect[s] a clear desire to limit the scope of defendants who are subject to products liability claims." *Id.* at 404.

Applying these principles, the *Butello* court concluded that the defendant, Paxport, "was not in the business of leasing the type of equipment that injured [the plaintiff], and that Paxport [was] not a product seller for the purposes of" the WPLA. *Id.* at 406. The court reasoned that Paxport's leasing activities were insufficient to warrant the application of product liability principles because there was no evidence that Paxport "ever engaged in the manufacture or sale of this type of equipment," "ever used [that] type of equipment in its own manufacturing process[,]" or "ever entered into a lease with any entity other than Western." *Id.* at 405. The court also reasoned that Paxport had not given Western a reason to rely on it to make the

machine safe and, in fact, Western was in a superior position to ensure the product's safety because, under the terms of the agreement, "Western selected, installed, maintained, repaired and operated" the machine, and Paxport leased the machine "without making any warranties regarding its condition, merchantability, or fitness for any particular purpose." *Id.* at 405–06.

Before addressing Oregon law, the Court notes that, although *Butello* does not cite the Restatement (Second) of Torts, Washington had adopted the Restatement's approach to product liability, found in section 402A, before the Legislature enacted the WPLA. *Seattle-First Nat. Bank v. Tabert*, 86 Wash.2d 145, 148 (1975). The policy rationale and limits on product liability announced in *Butello*, though synthesized from common law decisions in several jurisdiction, are also described in comments c and f to section 402A of the Restatement.[2]

---

[2] Comment c provides:

> *c.* On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

Restatement (Second) of Torts § 402A cmt. c (Am. Law Inst. 1965). And comment f provides:

> *f. Business of selling.* The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. . . .
>
> The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. Thus it does not

Next, the Court turns to the law governing AMC's assertion that NFC is a "manufacturer" and a "distributer" under Oregon law. Oregon's product liability statutory scheme is found at ORS 30.900 to ORS 30.928. The statutory scheme applies to all "product liability civil action[s]," which are defined as:

> [A] civil action brought against a manufacturer, distributor, seller or lessor of a product for damages for personal injury, death or property damage arising out of:
>
> (1) Any design, inspection, testing, manufacturing or other defect in a product;
>
> (2) Any failure to warn regarding a product; or
>
> (3) Any failure to properly instruct in the use of a product.

ORS 30.900. That definition encompasses "*any* claim based on a product defect or failure to warn or instruct," regardless of the theory of liability alleged. *Weston v. Camp's Lumber & Bldg. Supply, Inc.*, 205 Or. App. 347, 356 (2006) (emphasis in original). The statutory scheme also sets policies on the time to commence product liability actions (ORS 30.905, ORS 30.907, ORS 30.908, and ORS 30.928), an

---

apply to the housewife who, on one occasion, sells to her neighbor a jar of jam or a pound of sugar. Nor does it apply to the owner of an automobile who, on one occasion, sells it to his neighbor, or even sells it to a dealer in used cars, and this even though he is fully aware that the dealer plans to resell it. The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person, or even to his buyer, in the absence of his negligence. An analogy may be found in the provision of the Uniform Sales Act, § 15, which limits the implied warranty of merchantable quality to sellers who deal in such goods; and in the similar limitation of the Uniform Commercial Code, § 2-314, to a seller who is a merchant. This Section is also not intended to apply to sales of the stock of merchants out of the usual course of business, such as execution sales, bankruptcy sales, bulk sales, and the like.

*Id.* at cmt. f.

applicable evidentiary presumption (ORS 30.910), defenses to product liability claims (ORS 30.915), recoverable punitive damages (ORS 30.925 and ORS 30.927), and the elements of a strict product liability claim (ORS 30.920).

Unlike the WPLA, Oregon's product liability statutes do not define "manufacturer," "distributor," "seller," or "lessor." But like the WPLA's definition of "manufacturer," Oregon's statutory definition of a strict product liability claim includes an "engaged in the business of selling or leasing" requirement. *See* ORS 30.920(1) (providing, in part, that "[o]ne who sells or leases a product in a defective condition . . . is subject to liability for physical harm or damage to property caused by that condition," if "the seller or lessor is engaged in the business of selling or leasing" the kind of product that harmed the plaintiff). Oregon's statutory scheme provides little guidance about the elements of other product liability theories, so those contours have been explored in case law.

The Oregon Court of Appeals's decision in *Mason v. Mt. St. Joseph, Inc.*, 226 Or. App. 392 (2009), demonstrates that all defendants subject to liability in a "product liability civil action" under Oregon law, regardless of the theory of liability, must be engaged in the "business of selling" the relevant product within the meaning of the Restatement (Second) of Torts §402A.[3] In *Mason*, the court was tasked with determining whether a suit was a "product liability civil action" under ORS 30.900. The plaintiff was the personal representative of a construction worker who died from mesothelioma allegedly caused by his exposure to asbestos-containing products

---

[3] ORS 30.920(3) instructs Oregon courts to construe subsections (1) and (2) "in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965)."

Page 11 – OPINION AND ORDER

during his work on a construction project for the defendant. *Id.* at 394. The plaintiff alleged that the defendant was negligent in directing the decedent to install the products and failing to warn him of the risks of exposure to them and that defendant was vicariously liable for the product liability and negligence of the John Doe corporations that sold or distributed the products, because it required the purchase or reuse of the products in the construction project. *Id.* at 395. The plaintiff asserted that its direct negligence claim against the defendant was a "product liability civil action" because (1) the defendant was a "distributor" because it had directed that the asbestos products be used and (2) the defendant was a "manufacturer" because it manufactured products similar to the ones that injured the decedent. *Id.* at 398-99.

In concluding that the defendant was neither, the court followed Oregon's statutory construction methodology and assumed that a "'manufacturer' or 'distributor' of a defective product under ORS 30.900 is the same type of person or entity that is culpable under ORS 30.920 and its incorporated provisions of the Restatement (Second) of Torts § 402A comments a to m." *Id.* at 399. Looking to the dictionary definition of "distributor;" ORS 30.920, which expressly applies to a "seller" that is "engaged in the business of selling" the relevant product; and §402A Comment *f* of the Restatement (Business of Selling), the Court concluded that a "distributor" under ORS 30.900 must also be a seller; that is, a "distributor" must be in the business of selling, rather than an "occasional seller" of, the product. *Id.* at 400.

In rejecting plaintiff's "manufacturer" argument, the Court relied on slightly different grounds—that the defendant was not a "seller (including a

Page 12 – OPINION AND ORDER

manufacturer) . . . of [the] product that has harmed a consumer *of that product.*" *Id.* at 401 (emphasis in original). At the same time, that rationale recognized that the seller requirement applies in equal force to "manufacturers" and "distributors" in product liability civil actions.

As the analysis above shows, both the WPLA and Oregon product liability law require that defendants in a product liability action be "engaged in the business of selling" the product that caused harm to the plaintiff and both Washington and Oregon follow the approach set out in the Restatement (Second) of Torts section 402A comments c and f.

Based on the Court's review of Washington law, Oregon law, and the Restatement, the following factors guide this Court's determination of whether NFC is engaged in the business of selling: (1) whether NFC is in a better position than the consumer to exert pressure on the manufacturer to enhance the safety of spent hen or spent hen feed; (2) whether consumers typically look to NFC for advice on selecting, operating, and maintaining the spent hen or spent hen feed; (3) whether NFC can spread the costs of injury among the entire consuming public; and (4) whether NFC's transactions with NW Farm were more than occasional or casual or whether they were "isolated" transactions.

**B.    NFC is not "engaged in the business" of selling spent hen or mink feed made from spent hen.**

Whether NFC is a product seller engaged in the business of selling spent hen or spent hen feed under the WPLA or under Oregon product liability law depends on

the details of NFC's operations, namely the role NFC played in the production of the feed that NW Farm sold to AMC.

Mike Dynes, Production Manager at NFC, describes NFC as an egg producer that houses hens as part of its operations. The hens are used to lay eggs and are not maintained for any commercial meat purposes. When the egg production in the barn drops to a certain level, the hens in the barn are considered to be "spent hen," and the flock in that barn is euthanized and replaced. Dynes Decl. (Doc. 49-1) at 2, Oct. 31, 2018; *see also* Dynes Dep. (doc. 62-3) at 8: 2–4 (defining "spent hen" as "a bird that has reached the end of her useful life for laying eggs"). It takes NFC's contractors about a day to euthanize the approximately 9,000 hens in a barn. Dynes Decl. at 2. Typically, NFC disposes of its spent hen by sending it to a rendering plant or landfill. Both entities charge NFC for disposal services. However, between 2011 and 2016, NFC sometimes gave its spent hen to NW Farm to process for mink food. *Id.*

When providing spent hen to NW Farm, contractors hired by NFC would capture the live hens by hand, load them on to carts that held about 200 hens, and euthanize them with carbon dioxide. *Id.* The contractors would then push the carts out of the barn and transfer the hens to a conveyor belt. A NW Farm employee would then take the hens off the belt and put them whole into a portable grinder owned and operated by NW Farm.

NFC did not charge NW Farm for the spent hen, but "[b]y supplying the chickens to [NW Farm], NFC avoided rendering plant or landfill expenses." *Id.*; Dynes Dep. (62-3) at 25: 1–4. The arrangement was "on an as available/as needed

basis." Dynes Decl. at 3. Between January and May 2016, NW Farm obtained twenty-four barns of spent hen from NFC and produced over 850,000 pounds of ground spent hen. Gallegos Decl. (Doc. 62), Ex. 5. In total, NW Farm obtained spent hen on eight occasions, over the course of a total of twenty-four days, from four of NFC's Washington farms. *Id.*

NFC did not give spent hen to any other person or company to use as mink feed. Dynes Decl. (Doc. 77) ¶ 3, Feb. 15, 2019. Nor does NFC "advertise or otherwise market persons or entities to take the hens for animal feed." *Id.* ¶ 4. Additionally, NFC was not involved in the development, decision-making, or oversight of NW Farm's methods for processing spent hen into mink feed. NFC was not involved in the terms of sale between NW Farm and its members for the feed containing the spent hen. Finally, NFC was not involved in any risk–benefit determination of feeding the raw, uncooked, spent hen to the mink.

Under these circumstances, the three policy rationales from *Butello* and the Restatement do not suggest that NFC is "engaged in the business of selling" spent hen or mink feed made from spent hen. First, NFC is not in a better position than the consumer to exert pressure on the manufacturer to enhance the safety of the mink feed. NFC knew that NW Farm planned to use the spent hen as mink feed but had no input, control, or knowledge of the steps NW Farm took to make the ground spent hen into feed. Second, the consuming public would not typically look to NFC for advice on selecting, operating, and maintaining mink feed. NFC does not solicit entities or individuals to take their spent hen for mink feed and there is no evidence

Page 15 – OPINION AND ORDER

that NFC holds itself out to the public as a source of information regarding the use of spent hen as mink feed. Third, NFC was not in a better position than the consumer to absorb the cost of any injury caused by the product. Because NFC does not receive payment for its spent hen or market such products to the public, it cannot spread the costs of injury among the entire consuming public.

The circumstances also demonstrate that NFC engaged in only "occasional" and "casual" transactions to provide NW Farm with spent hen for use in mink feed rather than transactions in the ordinary course of their business. Although NFC is a more evolved supplier than the neighbor selling their homemade jam to another neighbor or the person selling their own car described in the Restatement, NW Farm was the only person or entity with which NFC engaged in this kind of transaction. Nor did NFC try to expand its spent hen supplying efforts by advertising or marketing spent hen for mink feed. And although the relationship between NFC and NW Farm involved more than a one-time transaction, and NFC received some financial benefit from the relationship by avoiding disposal costs, the relationship was informal, on an as-needed basis, and the amount of spent hen that NFC gave to NW Farm was incidental given the volume of spent hen that NFC regularly discards.

AMC argues that NFC should be liable under product liability law because it "intentionally puts millions of pounds of spent hen into the stream of commerce." Resp. (doc. 61) at 9. AMC asserts that "[t]he fact that [NW Farm] did not pay [NFC] is of no consequence[,]" because "[s]trict product liability applies to entities that distribute a defective product into the stream of commerce, even if that distribution

is gratuitous, and is not done for profit." *Id.* Although the cases and commentary cited by AMC do support the proposition that strict liability can arise from situations other than sales, they do not eliminate the requirement that the defendant be "engaged in the business of selling" or distributing the product at issue.

AMC relies on *Whitaker v. T.J. Snow Co.*, 953 F. Supp. 1034 (N.D. Ind. 1997), which supports this Court's conclusion that a defendant in a product liability action must be "engaged in the business of selling the product" that caused plaintiff's harm. *Whitaker* concerned the strict liability provision of Indiana's Product Liability Act which provides, in part, that "[o]ne who sells, leases, or otherwise puts into the stream of commerce any" defective product is "subject to liability for physical harm caused by that product to the user or consumer . . . *if . . . the seller is engaged in the business of selling such a product*[.]" *Id.* at 1039–40 (quoting Ind. Code § 33-1-1.5-3(a) (repealed 1998)) (emphasis added).

AMC also cites *Weston*, 205 Or. App. 347. In *Weston*, the plaintiffs asserted Unfair Trade Practices Act, trespass, negligence, and breach of express warranty claims against the defendant after the plaintiffs purchased lumber from defendant that was infested with a wood-boring beetle larvae. *Id.* at 352. The Court of Appeals' decision concerned whether ORS 30.905(1), the product liability statute of ultimate repose, governed each of the claims. To answer that question, the court had to determine whether each claim was "based on a product defect or failure under ORS 30.900." *Id.* at 356. The *Weston* court did not consider the issue presented here, whether product liability claims could be maintained against a particular defendant.

Finally, the commentary cited by AMC does not undermine the Court's conclusion that a product liability defendant must be in the business of selling the product that caused the plaintiff's harm. Instead, that commentary suggests that courts and states have expanded strict product liability beyond sales in the technical sense so that a defendant who *is* in the business of selling a product or is in the business of placing the product in the stream of commerce is not off the hook for harm caused to a plaintiff just because the particular product that harmed the plaintiff had not been sold. *See e.g.,* Am. L. Prod. Liab. 3d § 35:9 ("A company *in the business of selling* particular products, who gratuitously furnishes one of these products to a customer—for example, to rectify a problem created by an earlier product purchased by the customer—is strictly liable for injuries caused by a defect in the product." (emphasis added)); Am. L. Prod. Liab. 3d § 35:1 ("The rule that there need not be a sale in the technical sense, does not eliminate the strict liability requirements that the defendant who placed the product into the stream of commerce be in the business of selling such products for use or consumption, or of its placing the product into the stream of commerce." (Footnotes omitted)).

Here, NFC was not in the business of placing spent hen into the stream of commerce. The only spent hen from NFC's farms that ended up in a commercial product was the spent hen that NFC gave to NW Farm, and NFC did not market or advertise itself as a source of free spent hen. From this evidence, no reasonable jury could conclude that NFC supplied or marketed spent hen as a regular part of its business or sought to promote the use of spent hen as feed.

## C. NFC cannot be held liable for a product liability claim under the WPLA or Oregon product liability law.

In sum, the Court concludes that NFC is not a "manufacturer" under the WPLA and is not a "manufacturer" or a "distributor" under Oregon product liability law, because NFC is not engaged in the business of selling or providing spent hen or mink feed made from spent hen. Accordingly, the Court concludes that NFC is not a party that can be held liable for a product liability claim and that NFC is entitled to summary judgment with respect to AMC's product liability claim.

## III. AMC's Negligence Claim Against NFC

AMC also asserts a common-law negligence claim against NFC. NFC argues that it is entitled to summary judgment because, under Washington law, common-law negligence claims are subsumed by WPLA claims. Under Washington law, the WPLA is the exclusive remedy for product liability claims. *See Hue v. Farmboy Spray Co.*, 127 Wash.2d 67, 87 (1995) (noting that theories of product-based negligence are subsumed under a WPLA claim). However, because the Court concluded that NFC is not a "manufacturer" under the WPLA, no such claim can be brought against NFC and there is no WPLA claim to subsume AMC's negligence claim. *See Bostwick v. Ballard Marine, Inc.*, 127 Wash. App. 762, 773 (2005) ("Nothing in the WPLA relieves one who is not a product seller from liability for negligence."). And, as AMC points out, Oregon law permits plaintiffs to bring product-based claims under common law negligence. *Two Two v. Fujitec Am., Inc.*, 256 Or. App. 784, 794 (2013), *aff'd in part,*

*rev'd in part*, 355 Or. 319 (2014).[4] Accordingly, NFC is not entitled to summary judgement on this claim under either state's law.

## CONCLUSION

Defendant NFC's Motion for Summary Judgment (doc. 48) is GRANTED with respect to AMC's product liability claim and DENIED with respect to AMC's negligence claim.

IT IS SO ORDERED.

DATED THIS 29th day of January 2020.

_____
Ann Aiken
United States District Judge

---

[4] NFC did not respond to this argument and neither party offered arguments regarding the merits of AMC's negligence claim against NFC.