IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


AMC, LLC,                                           Case. No.: 6:17-cv-00119-AA
                                                    **OPINION & ORDER**
            Plaintiff,

NORTHWEST FARM FOOD COOPERATIVE and
NATIONAL FOOD CORPORATION,

            Defendants.

_____

AIKEN, District Judge:

        Plaintiff AMC, LLC, ("AMC") filed this action against defendant Northwest

Farm Food Cooperative ("NW Farm"), alleging product liability, negligence, gross

negligence, and contract claims in connection with "spent hen" mink feed that AMC

bought from NW Farm.  NW Farm moves for summary judgment (doc. 50) on all

claims.  For the reasons discussed below, NW Farm's Motion for Summary Judgment

(doc. 50) is GRANTED with respect to AMC's breach of implied warranty of

merchantability and breach of implied warranty of fitness claims and DENIED with

respect to all other claims.

## BACKGROUND

AMC is a commercial mink breeder. AMC alleges that almost 11,000 of its mink died in November 2016 after eating spent hen feed supplied by NW Farm that was contaminated with botulism toxin. AMC is an Oregon limited liability company with its principal place of business in Mt. Angel, Oregon.

NW Farm is an agricultural cooperative that supplies raw animal ingredients to mink ranchers and other commercial breeders of fur-bearing animals. Its principal place of business is in Burlington, Washington. In 1999, AMC became a member of the NW Farm cooperative and signed a "Membership and Supply Agreement" (the "Agreement") with NW Farm to purchase mink feed. Under the Agreement, AMC agreed to purchase a predetermined percentage of its mink feed from NW Farm. The Agreement at 1 (doc. 69-9). In return, NW Farm promised to "procure mink feed . . . at cost" and to "use its best endeavors to procure and distribute all feed . . . at the best prices and on the best terms obtainable in its judgment." *Id*. Because NW Farm operates as a cooperative, it may not lawfully make any profit for itself. Instead, NW Farm returns a proportionate share of the net proceeds to each member at the end of each fiscal year or, in the event of a loss, allocates that loss among the members on the same basis. *Id*.

NW Farm provides mink ranchers several feed options, including two different chicken products—spent hen and whole chicken parts. The spent hen product consists of spent hens—hens that have reached the end of their productive laying life. The spent hen is made into feed by grinding the whole chicken, including feathers,

heads, feet, and viscera, and then freezing, but not cooking, the product. The chicken parts product consists of neck, back, and thigh parts. Both products consist of raw (uncooked) chicken.

According to NW Farm General Manager Rowe, the spent hen product is priced lower than the chicken parts product because it poses a greater risk of disease due to the presence of raw viscera. Rowe Decl. ¶ 8 (doc. 53). To minimize the risk of disease in its spent hen product, NW Farm requires that its hen suppliers—who euthanize the hens before providing them to NW Farm—select only alive and healthy hens for euthanization and later processing. In his deposition, Rowe stated that "it's [his] understanding that botulism doesn't live inside a live chicken." Rowe Dep. 16:22–23 (doc. 69-8). NW Farm also requires its suppliers to purge the hens—take them off feed three days before euthanization—to "clean out the intestinal track [to] try to eliminate" the risk of *Clostridium botulinum* (the bacteria that produces the toxin responsible for botulism toxicity) and other bacteria colonizing the food remnants in the intestinal tracks. Rowe Dep. 16:5–19 (doc. 69-8).

According to AMC, it is standard practice in the mink industry to feed spent hen to mink, and it is safe to do so "as long as the spent hen is properly sourced, euthanized, and handled[.]" Hildebrandt Reply Report 7 (doc. 62-2). AMC has been feeding spent hen to its mink for approximately 20 years. AMC owner Richard Arritola prefers the spent hen product to the chicken parts product because "[t]he mink love it," they "don't get near as big" when they eat only chicken parts, and "[t]he

feathers [in the spent hen product] help stabilize the feed [so] we can add more moisture, which is a big plus for the animal." Arritola Dep. 147:19–148:9 (doc. 51-1).

In 2016, NW Farm obtained a new source of spent hen, National Food Corporation ("NFC"), which operates several egg farms in Washington. Typically, after euthanizing its spent hen, NFC would transport them to a rendering plant or landfill. But between January and July 2016, NFC instead provided spent hens to NW Farm without charge, saving NFC transportation and disposal costs. Rowe Decl. ¶ 12 (doc. 53); Dynes Dep. 25:1–4 (doc. 69-22). On approximately eight different occasions during that period, NW Farm dispatched a driver to an NFC location to pick up and process spent hens. Rowe Decl. ¶¶ 9, 12 (doc. 53).

General Manager Rowe testified that on each occasion, when NW Farm picked up hens at an NFC site, NW Farm "followed the same [spent-hen-processing] procedures it had followed over the last 20 years" without incident. Rowe Decl. ¶ 12 (doc. 53); NW Farm Answer ¶ 60 (doc. 17). Those procedures were as follows. NW Farm would dispatch to one of NFC's sites a driver with a mobile processor (a meat grinder), a truck, and a trailer filled with ice. According to Rowe, it was NFC's responsibility to select, euthanize, and load the hens onto a conveyer belt set up and maintained by NFC. Rowe Dep. 26:2–18 (doc. 69-8). The conveyer belt would then transport the euthanized hens onto a platform where the NW Farm driver raked or forked the chickens into NW Farm's processor. The driver who operated the processor was charged to ensure that the machine did not malfunction, and that "the chickens fit[]" into the processor, but the driver was not charged to inspect each chicken that

was going into the processor.  Rowe Dep. 26:24–25 (doc. 69-8); Abhold Dep. 40:6–17 (doc. 69-23).  After grinding the chickens into meat, the spent hen product would be deposited into the trailer and the driver would immediately return the load to NW Farm's plant.  At the plant, NW Farm would re-grind the product, freeze it into 50-pound blocks, and store it in a freezer kept at minus 10° Fahrenheit until it was delivered to Co-op members.  Rowe Decl. ¶ 10 (doc. 53).

In July 2016, AMC received a shipment of mink feed from NW Farm that NW Farm had produced from NFC's spent hens.  Compl. ¶ 12 (doc. 1); Rowe Decl. ¶¶ 16, 17 (doc. 53).  The day after being fed the spent hen product, AMC's mink began to get sick and die.  Approximately 11,000 of AMC's mink died over the course of a week, which AMC alleges "crippled its operation, and ultimately brought an end to a long-standing family business."  Pl's Resp. Def's Mot. Summ. J. 13 (doc. 67); Arritola Decl. ¶¶ 18–22 (doc. 68).

AMC alleges that the mink died from the botulism neurotoxin contained in the spent hen feed.  Laboratory testing of serum from four of the affected mink and samples of the spent hen feed delivered by NW Farm in July 2016 showed the presence of botulism neurotoxin Type C in the mink and in the feed that NW Farm obtained from spent hen supplier NFC.  USDA Laboratory Report, August 15, 2016 (doc. 69-17); *see also* Hildebrandt Expert Report 6–8 (doc. 70-1).[1]  Dr. Hildebrandt,

---

[1] NW Farm moves to strike Dr. Hildebrandt's two reports as inadmissible hearsay because they are not authenticated.  Def.'s Reply in support of Mot. Summ. J. 12 (doc. 80).  This Court construes NW Farm's Motion to Strike as an objection under Rule 56(c)(2).  *See* Fed. Rule Civ. Pro. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").  Rule 56 was amended in 2010 to allow a proponent of unauthenticated evidence to either cure an evidentiary defect or "propose a method to [do] so at trial." *Foreword Magazine, Inc. v. OverDrive, Inc.,* No. 1:10-vc-1144, 2011 WL 5169384, at *2 (W.D. Mich.

AMC's veterinary expert, opined that AMC's mink were killed by botulism toxin and that "the spent hen sold to AMC by Northwest Farm . . . was the source of [that] botulism toxin[.]"  Hildebrandt Expert Report 9 (doc. 70-1).  Dr. Hildebrandt also opined that the most likely cause of the botulism neurotoxin in the spent hen feed was a dead bird previously infected with the neurotoxin-producing bacteria, *Clostridium botulinum*, or similar contaminant in the spent hen feed.  Hildebrandt Expert Report 9 (doc. 70-1).  AMC owner Arritola testified that he was instructed by AMC's veterinarian that "due to the botulism AMC had to destroy the mink and could not keep and sell any of their pelts."  Arritola Decl. ¶ 19 (doc. 68).

On January 24, 2017, AMC filed a complaint alleging tort and contract claims against NW Farm.  Defendant now seeks summary judgment on those claims.

## STANDARD OF REVIEW

Summary judgment is appropriate if the moving party shows that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The materiality of a fact is determined by the substantive law on the relevant issue, while the authenticity of a dispute is determined by inquiring whether a reasonable jury could return a verdict for the

---

Oct. 31, 2011); *see also AOP Ventures, Inc. v. Steam Distribution, LLC*, No. EDCV 15-1586-VAP (KKx), 2016 WL 10586307, at *4 (C.D. Cal. Dec. 27, 2016) (reconsidering a decision to exclude a party's unsworn expert report because under the current construction of Rule 56 that party "should have been provided with an opportunity to show that the report could be authenticated[]").  In response to NW Farm's objection, AMC authenticated Dr. Hildebrandt's reports by submitting Dr. Hildebrandt's declaration in which he states "under penalty of perjury" that the Exhibits to which NW Farm objected are "are true and correct copies" of his reports and that he is prepared to testify to his opinions at trial. Hildebrandt Decl. ¶¶ 2, 3 (doc. 87).  Thus Dr. Hildebrandt's reports are admissible because they have been authenticated, and the Court may consider them in deciding NW Farm's Motion for Summary Judgment.

nonmoving party in light of the evidence presented. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). A dispute of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015) (citing *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)).

The moving party has the burden of establishing the absence of such genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324; Fed. R. Civ. P. 56(e). "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

## DISCUSSION

AMC asserts six claims against NW Farm: (1) gross negligence and negligence; (2) product liability; (3) breach of contract; (4) breach of implied warranty of merchantability; (5) breach of implied warranty of fitness for a particular purpose and; (6) breach of the implied covenant of good faith and fair dealing. NW Farm seeks summary judgment on all six claims. The Court begins with the product liability claim.

## I.    *Product Liability Claim*

AMC alleges that NW Farm sold mink feed to AMC that was "not reasonably safe," resulting in the loss of AMC's mink and the value of their pelts totaling more than $2.8 million.   Compl. ¶ 23 (doc.1).   In its Complaint, AMC referenced the Washington Product Liability Act ("WPLA") and its allegations appear to reference the elements of a WPLA claim.   Compl. at pp. 4–5 (doc. 1).

NW Farm asserts that it is entitled to summary judgment on AMC's product liability claim because the WPLA's economic loss rule bars AMC from recovering in tort for economic losses.   Def's Mot. Summ. J. 23–24 (doc. 50).   AMC responds that Oregon law, not Washington law, applies to its product liability claim and that under Oregon law, AMC can recover for damage to its mink.   Pl.'s Resp. to Def's Mot. Summ. J. 18–19 (doc. 67).   The Court turns first to the potential conflict of law raised by AMC.

### A.    *Choice of Law*

Federal courts sitting in diversity apply "the forum state's choice of law rules to determine the controlling substantive law."   *Fields v. Legacy Health Sys.,* 413 F.3d 943, 950 (9th Cir. 2005) (citing *Patton v. Cox,* 276 F.3d 493, 495 (9th Cir. 2002)). Oregon's Choice of Laws statute governs the choice of law applicable to noncontractual claims when a conflict between the laws of more than one state is at issue.   ORS 15.405 (2020).   Thus, when the parties disagree about whether Oregon or another state's law should apply to an issue related to a tort claim, courts must determine as a threshold issue whether there is a material difference between Oregon

law and the law of the other forum. *Waller v. Auto-Owners Ins. Co.*, 174 Or. App. 471, 475 (2001); *Machado-Miller v. Mersereau & Shannon, LLP*, 180 Or. App. 586, 591 (2002) ("In analyzing a choice-of-law problem, the threshold question is whether the different states' laws actually conflict with each other.") (citing *Lilienthal v. Kaufman*, 239 Or. 1, 5 (1964)). If there is no conflict between Oregon law and the law of the other forum, the Court need not conduct a conflict of law analysis.

Here, the parties dispute whether Oregon or Washington law should apply to the issue of whether AMC is barred from recovering in tort for the loss of its mink. As explained below, because the outcome is the same whether Oregon or Washington law applies, there is no actual conflict of laws, and the Court need not conduct a conflict of law analysis.

> **B.    *The WPLA's Economic Loss Rule***

Washington product liability claims are governed by the WPLA, which defines a product liability claim as "any claim . . . brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product[]" and includes claims previously based on strict liability in tort, common-law negligence, and contract causes of action, among other things. RCW 7.72.010(4) (2020). The WPLA also defines "harm" to include "any damages recognized by the courts of this state" provided that "the term 'harm' does not include direct or consequential economic loss under Title 62A RCW [Washington's Uniform Commercial Code]." RCW 7.72.010(6).

Thus, "the WPLA confines recovery to physical harm of persons and property and leaves economic loss, standing alone, to the Uniform Commercial Code." *Alejandre v. Bull*, 159 Wash. 2d 674, 684 (2007) (quoting *Touchet Valley Grain Growers*, *Inc. v. Opp & Seibold General Const., Inc.,* 119 Wash. 2d 334, 351 (1992)) (internal quotation marks omitted).

In *Eastwood v. Horse Harbor Foundation, Inc.*, 170 Wash. 2d 380, 387–88 (2010), the Washington Supreme Court determined that the economic loss rule was confusing. "The term 'economic loss rule' has proved to be a misnomer. It gives the impression that this is a rule of general application and any time there is an economic loss, there can never be recovery in tort." *Id.* The court renamed the doctrine the independent duty rule and clarified its scope. "An injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract." *Id.* at 389. The court held that, in general, when a contracted party asserts a tort remedy, courts must determine, on a case-by-case basis whether a tort duty arises independent of the terms of the parties' contract. *Id.*

The court then turned to the question of how to determine whether a duty arises independent of contract in a product liability case. *Id.* at 395. It explained that if a product defect results in personal injury or damage to other property (not the product itself), "the cause [of that harm] can plainly be a breach of the tort duty." *Id.* at 396. On the other hand, if a product defect results in injury only to the product itself, the court must do a risk of harm analysis to "determine[] whether the harm can reasonably be traced back to the tort duty." *Id.* The court thus distinguished

between an injury to other property that invokes a tort remedy and a "mere defect in the bargained-for quality[]" of a product that invokes a contract remedy. *Id.* at 395. *See also Duncan Place Owners Ass'n v. Danze, Inc.,* 927 F.3d 970, 972–73 (7th Cir. 2019) (applying Washington law and relying on *Eastwood* to hold that the independent duty doctrine did not bar condominium owners' claims against a faucet manufacturer for water damage to their units resulting from the allegedly defective faucets because that doctrine "does not bar recovery of damages for injury to *other* property caused by the defective product[]") (emphasis in *Duncan Place*).

NW Farm argues that the independent duty doctrine announced in *Eastwood* does not apply here because "no [Washington] court has applied the doctrine in the context of a product liability case." Def's Sur-Reply re Supp. Authority 2 (doc. 106). As NW Farm notes, *Eastwood* itself was not a product liability case. The *Eastwood* plaintiff was a lessor who brought a common law claim of waste against its lessee. *Eastwood*, 170 Wash. 2d at 383–84. The *Eastwood* court concluded that the lessee had a duty not to commit waste that arose independent of the lease and that the lessor's remedies were thus not limited to the lease's contract remedies. *Id.* at 383. To reach this conclusion, the *Eastwood* court first considered applying a bright line rule previously used in product liability cases to separate injury into three categories: (1) economic loss; (2) personal injury; and (3) property injury—the latter two categories recoverable in tort. *Id.* at 396. But the court determined that this analysis was too inexact to apply to real property cases such as the case of the *Eastwood* lessor. *Id.* ("Although these categories can be helpful, they are derived from product liability

cases. They can be confusing when removed from their original context. . . . [I]t can be unclear where economic loss ends and property damage begins[.]"). Thus, in the real property context, the court rejected the product liability categories and the economic loss rule and instead adopted a case by case approach to determine whether a plaintiff's harm is caused by a breach of a tort duty arising independent of contract.

Even though *Eastwood* was not a product liability case, the *Eastwood* court clearly stated how the rule applies in the product liability context. And although, since *Eastwood*, Washington courts have decided no product liability cases requiring the application of the independent duty rule, they have decided other analogous cases in which they applied the rule. In *Nichols v. Peterson NW, Inc.*, 197 Wash. App. 491, 502–03 (2016), the court relied on *Eastwood* to determine that the independent duty rule did not bar plaintiffs from recovering in tort from a roofing contractor for water and mold damage to their attic that resulted from the contractor's allegedly faulty repair. The court explained that "[the plaintiffs] d[id] not seek relief in tort for the defective construction of the roof itself; rather, they s[ought] such relief because the [contractor's] actions ostensibly caused property and personal injuries beyond the scope of the economic losses associated with the roof itself." *Id.* at 504.

NW Farm presents no caselaw in which a Washington court has departed from the 2010 *Eastwood* rule in a product liability case and instead relies on older cases (1985 to 1998) from other jurisdictions to support its assertion that AMC should be barred from recovering in tort for the loss of its mink. NW Farm's caselaw does not persuade the Court to depart from the Washington Supreme Court's clear instruction

to permit an action for tort recovery when an allegedly defective product causes harm to a plaintiff's other property.

NW Farm also argues that the independent duty doctrine does not apply here because the Washington Supreme Court confined the doctrine to real property cases. NW Farm relies on *Elcon Const. Inc. v. E. Wash. Univ.,* 174 Wn. 2d 157 (2012). But the *Elcon* court's warning was intended to discourage courts from raising the specter of contract law and remedies in tort actions such as fraud and tortious interference of contract. *Id.* at 165 ("We have not applied the independent duty doctrine to bar a claim for fraud, and we see no basis to utilize it in this case."). Thus, *Elcon* stands for the proposition that courts should not use the independent duty rule to trump tort remedies when a cause of action is squarely governed by tort law. *See also Hendrickson v. Tender Care Animal Hosp. Corp.,* 176 Wash. App. 757, 772 (2013) (holding that the trial court could not apply the independent duty rule to dismiss a plaintiff's negligent misrepresentation claim that did not arise from a real estate or construction contract).

The *Elcon* court relied on Justice Chambers' *Eastwood* concurrence to affirm that the independent duty rule applies in real property cases. *Elcon*, 174 Wn. 2d at 165. ("[W]e have applied the [independent duty] doctrine to a narrow class of cases, primarily limiting its application to claims arising out of construction on real property and real property sales[] 'based upon policy considerations unique to those industries.'") (quoting *Eastwood*, 170 Wash. 2d at 406–07 (Chambers, J., concurring)). But the *Elcon* court omitted Justice Chambers' full explanation that the doctrine is

applicable to *both* real property and products liability cases.  *See Eastwood*, 170 Wash. 2d. at 406–07 (Chambers, J., concurring) ("[T]his court has applied what we now call the independent duty doctrine only in cases involving product liability and claims arising out of construction or the sale of real estate.  Lower courts should be cautious in its application, especially outside of those narrow areas.").  Further, Justice Chambers provided clear instruction about where to draw the line between contract and tort remedy for product liability claims.

> [I]n the products liability context, if the product was hazardous and caused harm, the defendant breached the duty of care and tort law applied.  If the product merely disappointed the consumer in light of the contractual bargain, the defendant potentially breached a warranty, and the law of contracts applied.  WPLA did not (and does not) define "economic loss." . . . In that context, we said, "Generally speaking economic loss describes the *diminution of product value* that results from a product defect."

*Id.* at 414 (Chambers, J., concurring) (quoting *Washington Power Co. v. Graybar Elec. Co.,* 112 Wash. 2d 847, 856 n.5 (1989) (ellipses omitted) (emphasis added)).

Thus, the Washington Supreme Court has expressly stated that the independent duty rule applies to product liability cases and it has instructed courts how to apply the rule in those cases.  When a plaintiff seeks recovery for losses associated with damage to the product itself, a court must do a risk analysis to determine whether the defendant breached a tort duty arising independent of contract.  But when a plaintiff seeks recovery for damage to *other* property, a plaintiff may recover in tort.  Here, plaintiff claims loss to his other property—the mink—and thus is entitled to recover in tort.

NW Farm next argues that even if the independent duty rule applies, AMC's loss is not governed by an independent tort duty; it is governed by the express terms of the contract, which includes an exculpatory clause. The Agreement at 1 (doc. 69-9). As the *Eastwood* court explained, when a defendant's product causes damages to plaintiff's *other* property, that defendant breaches a tort duty that arises independent of the contract terms. Here, one of the contract terms is the exculpatory clause. The tort duty to plaintiff's other property arises independent of that term. Whether the Agreement's exculpatory clause defeat's AMC's tort claims is a separate issue that presupposes the existence of a tort duty in the first place and is discussed below.

Here, AMC does not seek to recover the loss of its bargain—the amount it spent to buy or replace the mink feed product. It seeks to recover damage to other property, its mink. As the *Eastwood* court explained, in a product liability case, damage to other property is recoverable in tort because damage to other property is not an economic loss within the meaning of the WPLA but instead is "plainly a breach of the tort duty." Thus, the WPLA's economic loss exclusion does not bar recovery for AMC's product liability claim.

### C. *Oregon's Purely Economic Loss Rule*

Under Oregon common law, the economic loss rule generally bars recovery in tort for purely economic losses. *Harris v. Suniga*, 344 Or. 301, 305 (2008). The Oregon Supreme Court has defined economic loss as "financial losses such as indebtedness incurred and return of monies paid, *as distinguished from damages for injury to person or property*." *Id.* at 310 (citing *Onita Pac. Corp. v. Trs. Of Bronson*,

315 Or. 149, 159 n.6 (1992) (emphasis in *Harris*)).    Thus, in product liability cases, the cost to repair or replace an allegedly defective product is a pure economic loss and recovery in tort for that loss is barred under the economic loss rule.    *Torch v. Windsor Surry Company*, No. 3:17-cv-00918-AA, 2019 WL 6709379, at *10 (D.Or. Dec. 9, 2019).  But damage to a plaintiff's *other* property is not a purely economic loss and is not barred under that rule.  *Id.*  Once again, AMC does not seek to recover the cost to replace the mink feed, the allegedly defective product; it seeks damages for injury to its other property—the mink.    Under Oregon law, such damages are not purely economic losses and are thus not subject to the economic loss rule.

### D.    *AMC is not barred from seeking damages for its mink loss.*

In sum, AMC is not barred from seeking recovery in tort for its mink losses under either Washington or Oregon law.    The WPLA does not bar recovery in this product liability claim because under Washington's independent duty rule, damage to AMC's other property caused by a defective product is a breach of defendant's tort duty that arises independent of contract.    Under Oregon law, the mink loss is not a purely economic loss because it is not a financial loss that was incurred to repair or replace the mink feed product.    Accordingly, neither Washington nor Oregon law bars AMC from recovering in tort for the loss of its mink.[2]    Thus, NW Farm is not entitled to summary judgment on AMC's product liability claim.

---

[2] NW Farm responds, in part, that since AMC's complaint refers to the WPLA, AMC should not be permitted to raise a product liability claim under Oregon law for the first time in its reply to NW Farm's motion for summary judgment.    NW Farm contends that AMC effectively amends its complaint without moving for leave of the Court.    Further, NW Farm asserts that because the parties "have engaged in extensive litigation over the past two years, [it is] entitled to rely on the claims pled in a complaint."    Def.'s Reply in Support of Mot. Summ. J. 2 (doc. 80).    NW Farm cites several district court decisions and two Ninth Circuit decisions that decline to recognize a party's new cause of action

## II.   *Gross Negligence Claim*

AMC alleges that NW Farm was grossly negligent in failing to protect against contaminants in the spent hen feed because NW Farm failed to use "ordinary, or even slight, care in selecting, supplying, euthanizing, procuring, storing, and/or delivering the Feed." Compl. ¶ 17 (doc.1). NW Farm responds that it is entitled to summary judgment on the gross negligence claim because AMC fails to provide substantial evidence that NW Farm failed to exercise slight care in supplying mink feed to AMC. The parties appear to agree that Washington law governs the gross negligence claim.[3]

In Washington, "gross negligence means the failure to exercise slight care." *Harper v. State*, 192 Wash. 2d 328, 342 (2018) (quoting *Nist v. Tudor*, 67 Wash. 2d 322, 324 (1965) (internal quotation marks omitted). "[T]his means not the total absence of care but care substantially or appreciably less than the quantum of care inhering in ordinary negligence." *Kelley v. State*, 104 Wash. App. 328, 333 (2000) (quoting *Nist*, 67 Wash. 2d at 331) (internal quotation marks omitted). "Thus, a person acts with gross negligence when he or she exercises 'substantially or appreciably' less than that degree of care which the reasonably prudent person would

---

raised in response to a summary judgment motion. Those cases are distinguishable from this one because AMC does not raise new allegations, plead a new cause of action, or add elements to a partially pled cause of action—AMC raises a potential conflict of law issue. But, as explained in this opinion, NW Farm's motion for summary judgment on AMC's product liability claim does not raise an actual conflict of law because there is no difference between the laws of Oregon and Washington as to the disputed issue.

[3] In their briefs, both parties cite only Washington law as to the gross negligence and negligence claims. Under Oregon's Conflict of Laws statute, "an agreement providing that an issue . . . will be governed by the law of a state other than Oregon is enforceable in Oregon if the agreement was entered into after the parties had knowledge of the events giving rise to the dispute." ORS 15.455 (2020). Accordingly, the Court will apply Washington law to these claims.

exercise in the same or similar circumstances." *Harper*, 192 Wash. 2d at 343 (quoting *Nist*, 67 Wash. 2d at 331) (emphasis omitted). "There is no issue of gross negligence without substantial evidence of serious negligence." *Kelley*, 104 Wash. App. at 333 (quoting *Nist*, 67 Wash 2d at 332) (internal quotation marks omitted). Thus, to survive summary judgment, a plaintiff alleging gross negligence must provide substantial evidence of serious negligence. *Harper*, 192 Wash. 2d at 345–46; *see also DeAsis v. Young Men's Christian Ass'n of Yakima*, No. 31531-2-III, 2014 WL 4376038, at *6 (Wash. Ct. App. Sept. 4, 2014) (holding that the issue of whether negligence rises to gross negligence presents a fact question to the jury when the plaintiff presents substantial evidence of seriously negligent conduct).

The Washington Supreme Court has instructed that, "in ruling on a motion for summary judgment, trial courts must specifically identify the relevant failure alleged by the plaintiff[,]" then determine whether the plaintiff presented substantial evidence that the defendant failed to exercise slight care, under the circumstances presented. *Harper*, 192 Wash. 2d at 344. "In determining whether the plaintiff has provided substantial evidence, the court must look at all the evidence before it, evidence that includes both what the defendant failed to do *and* what the defendant did." *Id.* at 346 (emphasis in original). "If a review of all the evidence suggests that reasonable minds could differ on whether the defendant may have failed to exercise slight care, then the court must deny the motion for summary judgment." *Id.*

Here, the parties do not dispute that euthanizing already-dead, sick, or recently-fed chickens increases the risk of the presence of botulism toxin in the

resulting spent hen feed.  To mitigate that risk, NW Farm required that NFC not feed the chickens for three days before euthanization and that NFC ensure that the chickens were alive and well up to the moment of euthanization.  Even though NW Farm had been supplying spent hen to its members for over twenty years, NFC was a new source of that product.  General Manger Rowe asserts that he discussed NW Farm's three requirements with NFC Production Manager Mike Dynes on several occasions and that the importance of the requirements "was well understood[.]"  Rowe Dep. 18:2–14 (doc. 69-8).

AMC contends that NFC was not complying with NW Farm's three requirements and that NW Farm knew that NFC was not complying.  First, AMC offers evidence that NFC could not have complied with the requirement to purge the chickens three days before euthanization because, according to NFC manager Dynes, NFC was required by industry standard to feed the chickens within 24 hours of euthanization.  Dynes Dep. 190:4–16 (doc. 69-22).  Second, AMC offers the testimony of NW Farm's driver who transported the mobile grinder to the NFC site and operated it there.  The driver testified that it was his job to rake or fork the euthanized chickens into the grinder.  Abhold Dep. 40:2–5 (doc. 69-23).  Although he was not charged to inspect the chickens, he testified that he would discard a chicken "that was an improper color or odor," Abhold Dep. 49:23–50:1 (doc. 62-4), or that "obviously look[ed] like [it] had been dead a while[.]"  Abhold Dep. 40:20–22 (doc. 69-23).  He stated that he would "[s]ometimes maybe . . . get seven birds that obviously look like they had been dead a while," Abhold Dep. 40:20–22 (doc. 69-23), and that on "any given day" it

"was 50/50 on whether [he] would see" a bird that had been "dead awhile." *Id*. at 40:24–41:6.  The driver also testified that he might have mentioned those birds "offhand" to NW Farm plant personnel, including the plant foreman.  Abhold Dep. 94:17–95:4 (doc. 62-4).

In addition, AMC offers the USDA laboratory report linking botulism toxin Type C in the spent hen lots delivered to AMC to the botulism toxin Type C in the serum of four of the dead mink.  Finally, AMC offers Dr. Hildebrandt's testimony that the likely cause of the minks' death was botulism toxin in the spent hen that NW Farm acquired from NFC.

AMC alleges that despite NW Farm's knowledge that NFC was euthanizing unfit chickens, NW Farm took no action to remedy the problem and instead continued to process the chickens into spent hen feed.  Specifically, AMC alleges that NW Farm failed to (1) observe NFC's process for selecting and euthanizing the hens; (2) verify the type of training received by the NFC workers who rounded up the chickens and euthanized them; (3) ask NFC what processes it used to prevent NW Farm from receiving previously dead chickens; (4) test the spent hens; and (5) assign an additional employee to inspect the hens before raking them into the processor.  Pl.'s Response to Def.'s Mot. Summ. J. 12, 15 (doc. 67).

In determining whether AMC presents substantial evidence of serious negligence, this Court must also examine the measures NW Farm took to protect the spent hen product from contaminants.  Because NW Farm was aware of the risk of botulism from unfit chicken in spent hen feed, it formulated a standard.  NW Farm

stated that it would accept only unfed, alive, and well chickens for processing. But NW Farm failed to monitor or enforce its own requirements. As a result, NW Farm's driver reported seeing abnormal appearing chickens headed into the grinder. Even though he removed the abnormal appearing chickens he happened to see, he was not assigned to inspect each chicken and he did not do so. Thus, even though NW Farm formulated a standard to protect against contamination, AMC presents evidence that NW Farm failed to take the steps necessary to ensure the successful implementation of that standard.

NW Farm took several other precautions to protect the spent hen feed from contamination: it filled the receiving trailer with ice, it immediately froze the product upon returning to its plant, it kept the product in cold storage at minus 10° until sold, and it sanitized its mobile processor when that processor returned from a job. Although important, these precautions do not mitigate the risk of botulism toxicity from botulism toxin in spent hen that were contaminated with the toxin *before* euthanization and processing.

The Court concludes that AMC presents substantial evidence to raise a material issue of fact as to whether NW Farm failed to exercise even slight care to protect the spent hen product from botulism toxin contamination. Accordingly, the Court denies NW Farm's motion for summary judgment on AMC's gross negligence claim.

### III.    *Negligence Claim*

In addition to alleging gross negligence, AMC alleges, in the alternative, that NW Farm failed to use ordinary care in protecting the mink feed from contamination when procuring or delivering that feed. Compl. ¶ 17 (doc. 1). NW Farm responds that it is entitled to summary judgment on AMC's negligence claim because AMC expressly waived any right to recover for such claim when it signed the Agreement, which contains an exculpatory clause. Def.'s Mot. Summ. J. 17–18 (doc. 50). The exculpatory provision is part of a larger paragraph that provides as follows:

> F.   ALLOCATION OF RISK: The Association will use reasonable endeavors to procure, process and distribute feed and other supplies and to maintain a reasonable standard of purity and quality. However; the parties hereby agree that all risk of loss, damage or injury from any and every act and/or neglect of the Association or other cause shall be borne solely by the member. All feed or supplies are purchased AS IS and the Association makes NO PRESENTATIONS OR WARRANTIES OR ANY NATURE OR KIND WHATSOEVER, EXPRESS OR IMPLIED (INCLUDING WITHOUT LIMITATION, OF MERCHANTABILITY OR OF FITNESS FOR ANY INTENDED USE OR PURPOSE) as to any feed or supplies. The member does hereby forever release, discharge and acquit the Association of all liability, damage, loss or claim by reason of any defect or impurities in any feed or supplies, any communicable disease transmitted by any feed or supplies, and/or any acts or omissions of any nature by the Association, its officers, agents, or employees.

The Agreement at 1 (doc. 69-9). As to the negligence claim, because the parties cite only Washington law in their briefs, they appear to agree that Washington law governs this claim.

In Washington, "[t]he general rule is that a party to a contract can limit liability for damages resulting from negligence." *American Nursery Products, Inc. v. Indian Wells Orchards,* 115 Wn. 2d 217, 230 (1990). Exculpatory clauses are

enforceable unless they are inconspicuous, violate public policy, or involve gross negligence. *Riley v. Iron Gate Self Storage*, 198 Wash. App. 692, 701 (2017) (citing *Scott v. Pac. W. Mountain Resort*, 119 Wash. 2d 484, 492 (1992)). But, as a threshold matter, "[e]xculpatory provisions are strictly construed under Washington law and are enforceable only if their language is sufficiently clear.*" Chauvlier v Booth Creek Ski Holdings*, 109 Wash. App. 334, 339–40 (2001). "A court determines the sufficiency of the language [of an exculpatory provision] as a matter of law." *Id.* at 340.

AMC argues that the clause is ambiguous with respect to negligence because the ALLOCATION OF RISK paragraph begins with NW Farm's promise to "use reasonable endeavors to procure, process and distribute feed and other supplies and to maintain a reasonable standard of purity and quality." Pl.'s Response to Def.'s Mot. Summ. J. 20 (doc. 67). AMC argues that "[b]y agreeing to use 'reasonable endeavors' and maintain a 'reasonable standard,' NW Farm was agreeing to bear the risk of its own negligence." *Id.* AMC further argues that because the capitalized text in the middle of the paragraph, which includes the AS IS notice and the warranty disclaimers, refers exclusively to contractual liability, the paragraph as a whole "should be interpreted as saying that NW Farm assumed the risk of its own negligence but that as along as NW Farm used reasonable efforts, it could not be held liable under the implied warranties[.]" *Id.* at 21. AMC does not address the exculpatory language that is located after the warranty disclaimers.

NW Farm responds that the provision is not ambiguous because it "specifically contemplates and disclaims any losses resulting from 'communicable diseases,' as

well as any impurities and/or defects in the feed or supplies." Def's Mot. Summ. J. 20 (doc. 50). The Court agrees. The provision's plain language includes a "release" "of all liability" for defects in the feed including "communicable diseases transmitted by any feed" and "and/or any acts or omissions" of the Association and its employees. A sophisticated party such as AMC would be expected to distinguish a release of liability for defects, acts, and omissions from a disclaimer of warranties.

The Court next examines whether the exculpatory provision is enforceable. Outside of the gross negligence context, Washington courts will enforce a waiver provision unless it is inconspicuous or violates public policy. *Chauvlier v. Booth Creek Ski Holdings*, 109 Wash. App. 334, 339 (2001). "An exculpatory agreement will not be upheld if the releasing language is so inconspicuous that reasonable persons could reach different conclusions as to whether the document was unwittingly signed." *Id.* at 341 (internal quotation marks omitted). "Factors in deciding whether a waiver and release provision is conspicuous include: whether the waiver is set apart or hidden within other provisions, whether the heading is clear, whether the waiver is set off in capital letters or in bold type, whether there is a signature line below the waiver provision, what the language says above the signature line, and whether it is clear that the signature is related to the waiver." *Johnson*, 176 Wash. App. at 461. In light of these factors, to prevail on its motion for summary judgment, NW Farm must show that the exculpatory provision is so conspicuous that no reasonable juror could conclude that AMC owner Arritola unwittingly signed it.

AMC argues that the exculpatory clause is not conspicuous because the waiver is located in the middle of a paragraph that begins with NW Farm's assurance that it will use "reasonable endeavors" and maintain a "reasonable standard" or purity in its feed;  the paragraph is headed ALLOCATION OF RISK with no mention of waiver or release; the release language is not set off by capital letters or any other special markings; and the signature block contains no language relating back to the waiver.

NW Farm responds that its exculpatory provision is conspicuous because it is similar to the liability release in *Chauvlier*.  In that case, a liability release on a ski pass application was determined to be conspicuous because it was clearly titled in all capital letters "LIABILITY RELEASE & PROMISE NOT TO SUE.  PLEASE READ CAREFULLY!"; the words "RELEASE" and "HOLD HARMLESS AND INDEMNIFY" were set off in capital letters throughout the application; and language just above the signature line read "Please Read and Sign: I have read, understood, and accepted the conditions of the Liability Release printed above." *Chauvlier*, 109 Wash. App. at 342.  NW Farm argues that the Agreement's clause is similarly conspicuous because it is not hidden; the ALLOCATION OF RISK heading is set off in capital letters; and there is language at the signature line urging the signer to read the Agreement before signing.

NW Farm's reliance on *Chauvlier* is misplaced.  In contrast to the *Chauvlier* heading "LIABILITY RELEASE & PROMISE NOT TO SUE," the Agreement's heading "ALLOCATION OF RISK" does not alert the signing party that it is giving up its legal rights.  Further, the signing block in *Chauvlier* contains the language

"Liability Release." It thus specifically relates back to the waiver. In contrast, the Agreement's signing block, located on the second page of the two-page Agreement, states "READ, CONSIDERED AND SIGNED" and "DO NOT SIGN WITHOUT READING" but does not mention the exculpatory clause located on the first page of the Agreement. Nor does the Agreement contain a signature line below the waiver provision itself.

In *McCorkle v. Hall*, 56 Wash. App. 80, 84 (1989), a Washington court held that a release in a fitness club application entitled "LIABILITY STATEMENT" was not conspicuous. The release language was buried in a longer paragraph that began with a statement that a member accepted liability for damages that the member or the member's guests caused. *Id.* at 81. The last sentence of the provision, which was not bolded or capitalized or otherwise set off, "stated that the member waived any claim for damages as a result of any act of a Club employee or agent. And nothing in the document alerted the reader to the shift in the liability discussion[.]" *Stokes v. Bally's Pacwest, Inc.,* 113 Wash. App. 442, 447 (2002) (explaining the *McCorkle* reasoning). In contrast, the exculpatory clause in *Bally's* was conspicuous because it was located in a paragraph titled "WAIVER AND RELEASE," and a notice under the signature line stated, "WAIVER AND RELEASE: This contract contains a WAIVER AND RELEASE in Paragraph 10 to which you will be bound." *Id.* at 448.

Here, the exculpatory provision is buried in a paragraph headed "ALLOCATION OF RISK." While the heading arguably alerts a party to a bargained-for risk of diminished product quality, it does not alert a party to a waiver of its torts

rights.  In the first sentence of the paragraph, NW Farm promises to use "reasonable endeavors" and to "maintain a reasonable standard."  The next several sentences contain an AS IS warning and then 27 words in capitalized typeface containing warranty disclaimer language.  Nothing in the paragraph alerts the reader of the shift from product disclaimers to tort liability waivers.  Further, unlike the product disclaimer language, the tort waiver language is not in capitalized typeface or otherwise set off, and there is no signature line below it.  Finally, the non-specific "DO NOT SIGN WITHOUT READING" in the signature block does not relate the signature line to the waiver provision.

Viewing the evidence in the light most favorable to AMC, the Court concludes that a reasonable juror could determine that the Agreement's exculpatory clause was so inconspicuous that AMC owner Arritola unwittingly signed it.  Accordingly, issues of fact remain concerning whether the clause is enforceable, and the Court need not reach the question of whether the clause violates public policy.  The Court already concluded that AMC provides substantial evidence that NW Farm failed to exercise slight care.  The same evidence is sufficient to support AMC's claim of negligence.  Because there is a genuine issue of material fact as to whether the exculpatory clause is enforceable and whether NW Farm was negligent, NW Farm is precluded from summary judgment on AMC's negligence claim.

## IV.  *Breach of Contract Claim*

AMC alleges that NW Farm breached the terms of the Agreement "by delivering feed that was unfit."  Compl. ¶ 26 (doc. 1).  NW Farm asserts that it is

entitled to summary judgment because AMC "fail[s] to identify any provision in the contract that would give rise to a duty to deliver feed that was fit." Def.'s Mot. Summ. J. 26 (doc. 50).

To prevail on a breach of contract claim under Washington law, a plaintiff must prove: (1) a valid contract; (2) breach of a duty arising under that contract; and (3) damages proximately caused by the breach. *Nw. Indep. Forest Mfrs. v. Dep't of Labor and Indus.,* 78 Wash. App. 707, 712 (1995). The breach does not need to be material but only a "failure to perform a contractual duty." *TMT Bear Creek Shopping Ctr., Inc. v. Petco Animal Supplies, Inc.,* 140 Wash. App. 191, 210 (2007). The remedy is intended "to place the injured party in the same economic position it would have occupied had the contract been fully performed." *Id.* at 211.

Washington courts "interpret clear and unambiguous [contract] terms as a question of law[,]" but an ambiguous provision, "one fairly susceptible to two different, reasonable interpretations" is a question for the factfinder. *Wm. Dickson Co. v. Pierce Cty.,* 128 Wash App. 488, 493–94 (2005). Washington follows the objective manifestation theory of contracts. *Hearst Commc'ns, Inc. v Seattle Times Co.,* 154 Wash. 2d 493, 503 (2005). Under that approach, "the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used." *Id.* at 503–04. Washington courts "give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.* at 504.

The parties dispute the threshold issue of whether the Agreement contains an express contractual provision that imposes a duty on NW Farm to provide fit feed. AMC responds that the Agreement does contain an express contractual provision because Paragraph F states that "[NW Farm] would use reasonable endeavors to procure, process and distribute feed and other supplies and to maintain a reasonable standard of purity and quality." Compl. ¶ 11 (doc. 1); The Agreement at 1 (doc. 69-9). NW Farm responds that in alleging that the feed was not fit, AMC seeks a breach of warranty remedy, not a breach of contract remedy. Def.'s Mot. Summ. J. 26 (doc. 50).

NW Farm relies on three cases in which the plaintiffs failed to identify an express contractual provision imposing a duty on the defendants. In *Minnick v. Clearwire US, LLC*, 683 F. Supp. 2d 1179, 1188 (W.D. Wash. 2010), the district court, applying Washington law, determined that an internet service provider did not breach its service contract by providing poor customer service because the service contract lacked "a contractual provision that would give rise to a duty to handle customer complaints in any particular fashion." In *Fidelity and Deposit Co. of Maryland v. Dally*, 148 Wash App. 739, 745–46 (2009), a collection agency did not breach its contract with a municipality when it made out checks to the city's municipal court instead of to "The City" because the contract failed to designate a check payee and thus did not impose a duty to make out checks to "The City." And in *Elliot Bay Seafoods v. Port of Seattle*, 124 Wn. App. 5, 12 (2004) a commercial lessee who made extra-contractual promises to build a pier project did not breach its lease

when it failed to build that project because the lease contained no "express promises or covenants" to do so.

Unlike the cases cited by NW Farm, the Agreement here contains an express promise made by NW Farm to use "reasonable endeavors to procure, process and distribute feed . . . and to maintain a reasonable standard of purity and quality." The Agreement differs from the *Minnick* contract, for example, because the internet service provider there made no express promise to use reasonable efforts to maintain a reasonable customer service response. "If the [contract's] language is clear and unambiguous, the court must enforce the contract as written; it may not modify the contract or create ambiguity where none exists." *Lehrer v. State, Dept. of Social and Health Services*, 101 Wash. App 509, 515 (2000) (citing *McDonald v. State Farm Fire & Cas. Co.,* 119 Wash 2d 724, 733 (1992). Thus, the Agreement contains an express contractual provision a duty on NW Farm.

However, the nature of the duty that the promise imposes on NW Farm is ambiguous. A reasonable factfinder could conclude that the provision in Paragraph F imposes a duty to reasonably try to secure feed of a certain standard. A reasonable factfinder could also conclude that the provision imposes a duty to actually "maintain" feed at a certain standard. Further questions arise as to the nature of "reasonable endeavors" and as to the nature of "reasonable standard of purity and quality." Because Paragraph F expressly sets out a contractual duty allegedly breached by NW Farm and because there is more than one reasonable interpretation as to the nature

of that duty, NW Farm is not entitled to summary judgment on AMC's breach of contract claim.

## V.    *Breach of Warranty Claims*

AMC asserts claims against NW Farm for breach of the implied warranty of merchantability and breach of the implied warranty of fitness for a particular purpose.  NW Farm contends that it is entitled to summary judgment on these claims because the Agreement expressly disclaims the implied warranties.  The Agreement's disclaimers are located in a paragraph that reads as follows:

> F.   ALLOCATION OF RISK: The Association will use reasonable endeavors to procure, process and distribute feed and other supplies and to maintain a reasonable standard of purity and quality.  However; the parties hereby agree that all risk of loss, damage or injury from any and every act and/or neglect of the Association or other cause shall be borne solely by the member.  All feed or supplies are purchased AS IS and the Association makes NO PRESENTATIONS OR WARRANTIES OR ANY NATURE OR KIND WHATSOEVER, EXPRESS OR IMPLIED (INCLUDING WITHOUT LIMITATION, OF MERCHANTABILITY OR OF FITNESS FOR ANY INTENDED USE OR PURPOSE) as to any feed or supplies.  The member does hereby forever release, discharge and acquit the Association of all liability, damage, loss or claim by reason of any defect or impurities in any feed or supplies, any communicable disease transmitted by any feed or supplies, and/or any acts or omissions of any nature by the Association, its officers, agents, or employees.

The Agreement at 1 (doc. 69-9).  AMC argues that the disclaimers are not enforceable because they were not explicitly negotiated.  Pl.'s Resp. to NW Farm's Mot. for Summ. J. 19 (doc. 67).

Article 2 of the Uniform Commercial Code ("UCC")—in Washington, RCW chapter 62A—applies to transactions in goods.  RCW 62A.2–102 (2020).[4]  The parties

---

[4]  As to the contract claims, the Oregon Choice of Laws statute provides that the contractual rights and duties of the parties are governed by the law that the parties have chosen.  ORS 15.350(1).

agree in their briefing that Article 2 applies to mink feed. The parties further agree that they are merchants under the UCC and that the transaction at hand is a commercial, not a consumer, transaction. *See* RCW 62A.2-104(1), (3).

The UCC's implied warranties of goods for sale arise at the time of contracting. RCW 62A.2-314. Under the implied warranty of merchantability, a seller warrants that the goods "are fit for the ordinary purposes for which [they] are used[.]" RCW 62A.2-314(2)(c). The implied warranty of fitness for a particular purpose arises when the seller "has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods[.]" RCW 62A.2-315.

The UCC allows a seller to limit or exclude implied warranties: "Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is' . . . or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty[.]" RCW 62A.2-316(3)(a).

In Washington, warranty disclaimers are not enforceable if they are unconscionable. *Puget Sound Financial, L.L.C. v. Unisearch, Inc.*, 146 Wash. 2d 428, 438 (2002). Courts determine whether disclaimers are unconscionable as a matter of law. *Id.* "Washington courts have adopted a totality of the circumstances approach

---

In the case of a standard form contract drafted primarily by only one of the parties, the choice of law must be express and conspicuous. *Id.* The Agreement expressly provides that it "will be governed by the laws of the state of Washington." The Agreement at 2 (doc 69-9). In addition, as to the contract claims, both parties have cited and applied Washington law in their briefs and thus agree that Washington law applies to those claims.

for deciding the enforceability of a warranty disclaimer in a commercial setting[]" based on four non-exclusive factors:  (1) the conspicuousness of the disclaimer, (2) the presence or absence of negotiation about the disclaimer; (3) the custom and usage of the trade; and (4) any policy developed between the parties through the course of dealing. *All Star Trucking LLC v. Ryder Vehicle Sales, LLC*, No. 75352-5-I, 2017 WL 3142421, at *3 (Wash. Ct. App. July, 17, 2017) (citing *Puget Sound Fin.,* 146 Wash. 2d at 439).   Under the UCC, a disclaimer of merchantability must mention merchantability and, in the case of a writing, it must be conspicuous.  RCW 62A.2-316(2).  A disclaimer of fitness "must be by a writing and conspicuous."  *Id*.  In Washington, disclaimers in commercial contracts are presumed conscionable unless the party challenging it shows otherwise.  *All Star Trucking LLC*, 2017 WL 3142421 at *3.

AMC urges the Court to apply a different test to determine whether the disclaimers are enforceable:  the two-prong *Berg* test that requires disclaimers to be explicitly negotiated and set forth with particularity.  *Berg v. Stromme,* 79 Wash. 2d 184, 196 (1971) (rejecting a waiver of implied warranty in a new car purchase contract in a consumer transaction because it had not been explicitly negotiated nor set forth with particularity).  AMC argues that the *Berg* test is appropriate because the four-factor analysis applies only to limitations of consequential damages in commercial service contracts, not to disclaimers of warranties in commercial sales transactions.[5]

---

[5]  Both *Puget Sound Financial* and *All Star Trucking* applied the four-factor analysis to determine the enforceability of disclaimers in commercial contracts.  *Puget Sound Financial* involved a commercial service contract.  *Puget Sound Fin.,* 146 Wash. 2d at 431.  AMC reads *Puget Sound* narrowly and argues that the four-factor approach applies only to disclaimers in commercial service

Pl.'s Resp. to NW Farm's Mot. for Summ. J. 25 (doc. 67).  Application of the *Berg* rule here would render the disclaimers unenforceable since neither party disputes that the disclaimers were not explicitly negotiated.

To support its contention that the Court should apply the *Berg* rule instead of the four-factor totality of the circumstances analysis, AMC relies on two cases.  In the first case, *Hartwig Farms, Inc. v. Pacific Gamble Robinson Co.*, 28 Wash. App. 539, 542–43 (1981), a Washington court invalidated a commercial sales disclaimer printed on an invoice received by a buyer *after* an oral sale of a seed product.  The court initially cited the *Berg* rule but then explained that "[a] disclaimer which is made after a sale is completed cannot be effective because it was not a part of the bargain between the parties."  *Id*. at 543.

*Hartwig Farms* was later distinguished *by Am. Nursery Prod.*, 115 Wn. 2d at 224, in which the Washington Supreme Court explained that the *Berg* rule should not be applied to commercial transactions unless there are "indicia of unfair surprise." The court reasoned that "[i]n consumer sales transactions, intervention is warranted to counteract the inherent inequality of bargaining power and the resultant inequities.  Parties to a commercial contract, however, generally have equal bargaining power and an equal ability to seek advice and alternative offers."  *Id*.  The court determined that the disclaimer in that case, which was located in the original written contract, did not unfairly surprise the buyer.  *Id*. at 224–25.  Accordingly, it

---

contracts.  But AMC fails to address *All Star Trucking*, which applied the same approach to a disclaimer in a commercial sales contract.  *See All Star Trucking*, 2017 WL 3142421 at *3.

declined to apply the stricter *Berg* requirements and instead used a totality of the circumstances analysis to determine whether the disclaimer was valid.  *Id.* at 224.

AMC also relies on *Western Recreational Vehicles, Inc. v. Swift Adhesives, Inc.*, 23 F.3d 1547, 1554 (9th Cir. 1994), in which the Ninth Circuit applied Washington law to affirm a lower court's invalidation of a commercial sales disclaimer sent to the buyer on after-sale invoices.  The court chose to follow *Hartwig Farms* instead of *American Nursery Products* because the court determined that the after-sales invoice disclaimers involved "unfair surprise."  *Id.* at 1555.  Both *Hartwig Farms* and *Western Recreational Vehicles* involved disclaimers that appeared for the first time on after-sales invoices.  It was the potential for unfair surprise that triggered application of the *Berg* rule.  Those cases are distinguishable from the case at hand.  The disclaimers here, like the disclaimers in *American Nursery Products*, appear in the original written contract; they were not sprung as a surprise on an after-sales invoice.  The potential for unfair surprise that triggered application of the *Berg* rule in *Hartwig Farms* and *Western Recreational Vehicles* is absent here.  The Court thus applies the four-factor totality of the circumstances analysis to determine whether the disclaimers are enforceable.

The following factors guide the Court's analysis:  (1) the conspicuousness of the disclaimers; (2) the presence or absence of negotiation about the disclaimers; (3) the custom and usage of the trade; and (4) any policy developed between the parties through the course of dealing.

### A. *Conspicuousness*

Under the UCC, a disclaimer that is not conspicuous is not enforceable. As a matter of law, courts decide whether language is conspicuous. RCW 62A.1-201(a)(10); *Hartwig Farms, Inc*., 28 Wash. App. at 546. To be conspicuous a term must be "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." RCW 62A.1-201(a)(10). "A factor to consider is the sophistication of the parties." *Sierra Diesel Injection Serv., Inc., v. Burroughs Corp., Inc*. 890 F.2d 108, 114 (9th Cir. 1989).

NW Farm argues that the disclaimers are conspicuous because they specifically mention merchantability and fitness, are set out in capitalized text, contain a capitalized "AS IS" provision, and are located under the capitalized "ALLOCATION OF RISK" heading. AMC responds that the disclaimers are not conspicuous because they "[are] not set apart from the rest of the [Agreement]," the heading ALLOCATION OF RISK "does not make clear that [the paragraph it heads] contains a disclaimer of warranties, there is no signature line immediately below the disclaimer[s], and it is not clear that the signature relates to the disclaimer[s.]" Pl.'s Resp. to NW Farm's Mot. for Summ. J. 21 (doc. 67).

AMC bases its analysis on the six-factor test used by Washington courts to determine whether a "Waiver and Release" is "so inconspicuous that reasonable persons could reach different conclusions as to whether the document was unwittingly signed." *Johnson v. UBAR, LLC*, 150 Wash. App. 533, 538 (2009) (quoting *McCorkle v. Hall*, 56 Wash. App. 80, 83 (1989) (internal quotation marks

omitted).    While the Court used this test to determine that the Agreement's exculpatory clause was not enforceable, the Court declines to use this test to determine whether the Agreement's warranty disclaimers are enforceable. Washington courts use the six-factor test exclusively in the torts' context.  But, when contractual rights are at issue, Washington courts follow the UCC guideposts.

Under the UCC, conspicuous terms include "[a] heading in capitals equal to or greater in size than the surrounding text" and "[l]anguage in the body of a record . . . in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size[.]"  RCW 62A.1-201(10)(A)–(B).

Accordingly, Washington courts review disclaimers to determine whether they are "hidden in a maze of fine print." *Puget Sound Fin.,* 146 Wash. 2d at 442 (quoting *Am. Nursery Prod.*, 115 Wash. 2d at 222).    Washington courts have found the following disclaimer characteristics conspicuous:  same-size type terms that occupy 2 lines of an 11 line provision titled "Default; Remedies" in a six page contract, *Am. Nursery Prod.*, 115 Wash. 2d at 225; same-size type terms in blue print in a separate box with a blue background at the top of a contract, *Puget Sound Fin.,* 146 Wash. 2d at 442; same-size type terms in paragraph 21, titled "DEFAULT REMEDIES," and a separate signature page directing attention to that paragraph, *Torgerson v. One Lincoln Tower, LLC*, 166 Wash. 2d 510, 520 (2009); and same-size type terms, bolded and in all capital letters, specifically mentioning the implied warranties of merchantability and fitness and located at the top of a separate page containing a limited warranty, *All Star Trucking,* 2017 WL 3142421 at *3.  In contrast, when a

disclaimer is in the smallest size type of all text on an invoice, it is inconspicuous. *Hartwig Farms, Inc.,* 28 Wash. App. at 545.

Here, the disclaimers are located at the bottom of the first page of a two-page contract in a paragraph titled "ALLOCATION OF RISK." The provision specifically mentions the warranties of merchantability and fitness. The disclaimers are set out in 27 words, in all capital letters, and occupy 2 out of only 10 total lines in that paragraph. The disclaimer language is preceded by the words "AS IS." Unlike the *All Star Trucking* contract, the disclaimers here are not in bold type and are not located at the top of a separate page. And unlike the *Torgerson* contract, AMC did not sign a separate page directing it to the disclaimers paragraph. But the Agreement is only a page and half long and contains eight short paragraphs. The disclaimers are located on the first page in paragraph six, not paragraph 21 as in *Torgerson*. They are set off from the surrounding text by the capitalized typeface.

Based on these facts, the Court concludes that the disclaimers are not buried in a mass of fine print and that a reasonable sophisticated party in AMC's position would have noticed them. The first factor, conspicuousness, thus favors enforcing the Agreement's disclaimers of the implied warranties.

**B.**    *Negotiation of the Disclaimer*

The Court next considers whether the parties negotiated the Agreement's disclaimers. The parties agree that they did not discuss or negotiate the Agreement's disclaimers although during its seventeen-year relationship with NW Farm, AMC

had ample opportunity to do so. The second factor is thus neutral and neither favors nor disfavors enforcing the Agreement's disclaimer of the implied warranties.

### C.    *Custom and Usage of the Trade*

Next, the Court considers the third factor—whether it is customary among mink feed cooperatives to include disclaimers of the implied warranties of merchantability and fitness in contracts for the sale of feed. The UCC defines a usage of trade as "any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." RCW 62A.1-303(c). Further, "[t]he existence and scope of such a usage must be proved as facts." *Id.*

NW Farm asserts that it is customary among mink fed cooperatives to include warranty disclaimers in contracts for the sale of mink feed. NW Farm has been in the business of supplying feed to fur breeders for over 70 years, and Rowe has worked for NW Farm for 40 years. Rowe Decl. ¶ 2 (doc. 53). In his declaration, Rowe asserts that mink breeders "expressly seek ground, whole raw chicken to custom mix their own mink feed because they believe it offers various benefits to their mink . . . and because it is the cheapest bulk source of protein for their mink[]" but that raw spent hen and other raw feeds are inherently "volatile" or susceptible to disease. Rowe Decl. ¶¶ 7, 13 (doc. 53). Rowe explains that the "inherent risks of disease" from raw mink feed is one reason for the Agreement's Allocation of Risk provision. *Id.* at ¶ 13. He asserts that "it is common practice for mink feed cooperatives and their members to allocate risks in ways similar to those found in [the Agreement]" and that he is

aware of a least one other cooperative, the Fur Breeders Agricultural Cooperative in Utah, that also disclaims implied warranties as to feed. *Id.* at 15.

AMC responds that "a single agreement is not evidence of the custom and usage of trade across the industry." Pl.'s Resp. Def's Mot. Summ. J. 27 (doc. 67). But AMC fails to provide evidence to contradict Rowe's declaration, which was based on 40 years of experience in the industry, or evidence that the two agreements at issue here are not typical of the trade. Because AMC fails to contradict this evidence, the Court accepts it as representative of the trade. *See M.A. Mortenson Co., Inc. v. Timberline Software Corp.,* 140 Wash. 2d 568, 585 (2000) ("While trade usage is a question of fact, *undisputed* evidence of trade usage may be considered on summary judgment.") (emphasis in original); *Graaf v. Bakker Bros. of Idaho, Inc.,* 85 Wash. App. 814, 818 (1997) ("[Seller's] representation of the trade practice is uncontradicted. And we therefore accept it as fact."). The third factor, trade usage, thus favors enforcing the Agreement's disclaimers of the implied warranties.

### D.     *Course of Dealing Between the Parties*

The Court considers the fourth factor—whether the parties' course of dealing sheds light on the parties' intent as to the disclaimers. "A course of dealing is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." RCW 62A.1-303(b).

AMC argues that the course of dealing between the parties is either neutral or favors not enforcing the disclaimers because the invoices it received from NW Farm did not reiterate the Agreement's warranty disclaimers. AMC contrasts its situation with that of the buyer in *Puget Sound Financial*, who received 48 invoices from the seller, all of which contained the seller's warranty disclaimers. *Puget Sound Fin.,* 146 Wash. 2d at 436–37. The *Puget Sound* court held that a course of dealing may favor enforcing a disclaimer when a party repeatedly sends invoices containing identical disclaimers. *Id*. But the *Puget Sound Financial* buyer, unlike AMC, entered into an oral, not a written contract, with the Seller. *Id*. at 434. The invoices in that case supplied a missing contract term, without which the court could not have found that the parties achieved "a common basis of understanding[.]" *Id*. at 436. Here, in contrast, the disclaimers are not alleged to be missing or ambiguous terms. They are contained in the Agreement. The absence of the same disclaimers in later invoices does not alter the parties' agreement to the original contract terms.

NW Farm argues that the course of dealing favors enforcing the disclaimers because AMC "continued to benefit from membership in the Cooperative, including dividends and access to a steady supply of low cost feed that it would not otherwise enjoy." Def.'s Mot. Summ. J. 28 (doc. 50). AMC also received a discount for the higher risk spent hen product, from which the Court infers that AMC accepted the AS IS terms of the Agreement. Thus, the Court finds that the course of dealing between the parties favors enforcing the Agreement's disclaimers of the implied warranties.

## E.    *The Implied Warranty Disclaimers are Enforceable*

Based on the Court's analysis of the four factors used by Washington courts to determine whether a disclaimer of implied warranties in a commercial sales transaction between sophisticated parties is enforceable, the Court finds that three factors—conspicuousness of the disclaimer in the Agreement, the unrebutted evidence of trade usage in the mink feed industry, and the course of dealing between the parties—favor enforcing the disclaimers.   The other factor—absence of negotiation despite ample opportunity to do so—is neutral.   Viewing these factors in the totality of the circumstances, the Court concludes that the disclaimers of the implied warranties are enforceable, and that no genuine disputes of material fact preclude the Court from granting NW Farm's motion for summary judgment in its favor on AMC's breach of the implied warranty claims.

## VI.    *Breach of the Implied Covenant of Good Faith and Fair Dealing Claim*

Under Washington law, "there is in every contract an implied duty of good faith and fair dealing that obligates the parties to cooperate with each other so that each may obtain the full benefit of performance."  *Rekhter v. State*, 180 Wash. 2d 102, 112–13 (2014) (quoting *Badgett v. Sec. State Bank*, 116 Wash. 2d 563, 569 (1991)) (brackets and internal quotation marks omitted); *see also* RCW 62A.1-304 ("Every contract or duty within this title imposes an obligation of good faith in its performance and enforcement.").   The implied duty of good faith cannot "add or contradict express contract terms and does not impose a free-floating obligation of good faith on the parties."  *Rekhter*, 180 Wash. 2d at 113.  "It may violate the duty of good faith and

fair dealing to . . . (1) evade the spirit of a bargain; (2) willfully render imperfect performance; (3) interfere with or fail to cooperate in the other party's performance; (4) abuse discretion granted under the contract; or (5) perform the contract without diligence." *Microsoft Corp. v. Motorola, Inc.*, 963 F. Supp. 2d 1176, 1184 (W.D. Wash. 2013). This list is in not exhaustive. *Id.* "It is the fact finder's job . . . to determine whether a party breached its duty of good faith and fair dealing." *Id.*

AMC asserts that NW Farm breached its duty of good faith and fair dealing by delivering feed that was unfit. NW Farm argues that it is entitled to summary judgment because the Agreement contains no express provision for delivering fit feed and thus no resulting obligation to perform that duty in good faith. However, because this Court concluded that paragraph F of the Agreement contains NW Farm's express promise to use reasonable endeavors to maintain a reasonable standard of feed quality, a reasonable jury could conclude that NW Farm violated its duty of good faith and fair dealing when it supplied AMC feed containing botulism toxin Type C. Accordingly, NW Farm is not entitled to summary judgment on AMC's breach of the implied covenant of good faith and fair dealing claim.

## CONCLUSION

For the reasons set forth above, NW Farm's Motion for Summary Judgment (doc. 50) is GRANTED with respect to AMC's breach of implied warranty of merchantability and breach of implied fitness claims and DENIED with respect to all other claims.

IT IS SO ORDERED.

Dated this  21st  day of August 2020.


_____/s/Ann Aiken_____
Ann Aiken
United States District Judge